[No. S099339. Apr. 7, 2003.]

DARLENE BONANNO, an Incompetent Person, etc., Plaintiff and Respondent, v.
CENTRAL CONTRA COSTA TRANSIT AUTHORITY, Defendant and Appellant;
DIANA BONTA´, as Director, etc., Claimant and Respondent.

DARLENE BONANNO, an Incompetent Person, etc., Plaintiff and Appellant, v.
CENTRAL CONTRA COSTA TRANSIT AUTHORITY, Defendant and Respondent;
DIANA BONTA´, as Director, etc., Claimant and Respondent.

**COUNSEL**

Law Offices of Walker & Hamilton, Walter H. Walker III, Timothy M. Hamilton; and Dane J. Durham for Plaintiff and Appellant and for Plaintiff and Respondent.

Low, Ball & Lynch, David B. Lynch, Dale L. Allen, Jr., Jennifer C. Rasmussen, Christopher E. Arras and Charles D. Redfield for Defendant and Appellant and for Defendant and Respondent.

Rankin, Landsness, Lahde, Serverian & Stock, Michael C. Serverian and Alan S. Liang for California Transit Insurance Pool as Amicus Curiae on behalf of Defendant and Appellant and Defendant and Respondent.

Hanson, Bridgett, Marcus, Vlahos & Rudy, David W. Baer and Kurt A. Franklin for San Mateo County Transit District and 200 other public entities as Amici Curiae on behalf of Defendant and Appellant and Defendant and Respondent.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant and Defendant and Respondent.

Law Offices of Ellen Lake and Ellen Lake for Plaintiff and Respondent.

Mark P. Robinson; Jr.; Roland Wrinkle; Harvey R. Levine; Robert Steinberg; Thomas G. Stolpman; William D. Turley; Mary E. Alexander; Joseph Harbison III; Bruce Broilett; Douglas Devries; Leonard Sacks; Tony Tanke; Lea-Ann Tratten; Steven J. Kleifield; David Rosen; Moses Lebovits; Christine Spagnoli; James Sturdevant; Daniel Smith; Deborah David; Lawrence Drivon; Thor Emblem; Rick Simons; David Casey, Jr.; Law Offices of Ian Herzog, Evan D. Marshall and Ian Herzog for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Respondent.

Bill Lockyer, Attorney General, Stephanie Wald and Angela Botelho, Deputy Attorneys General, for Claimant and Respondent.

## OPINION

**WERDEGAR, J.**—The question presented is whether the location of a bus stop may constitute a "dangerous condition" of public property, within the meaning of Government Code sections 830 and 835,[1] where, in order to reach the stop, bus patrons must cross a busy thoroughfare at an uncontrolled intersection. Assuming all other elements of an action under section 835 are proven, we conclude it may; no rule of law precludes imposition of liability on this basis. We therefore affirm the judgment of the Court of Appeal, which affirmed a judgment on jury verdict for plaintiff Darlene Bonanno, who was injured while attempting to cross an arterial street to reach a bus stop maintained by defendant Central Contra Costa Transit Authority (CCCTA).

### FACTUAL AND PROCEDURAL BACKGROUND

The facts are drawn in large part from the opinion of the Court of Appeal.

CCCTA began providing bus services to Contra Costa County (County) residents in 1982, taking over routes from the Alameda-Contra Costa Transit District. At that time, a bus stop (consisting simply of a route sign placed in compacted gravel) was located on the north side of Pacheco Boulevard (Pacheco) near the intersection of Pacheco and DeNormandie Way (DeNormandie), in an unincorporated area of the County near the City of Martinez. In the early 1980's, residents in the neighborhood of that intersection made it known to County officials that they were having difficulty crossing Pacheco to get to and from the bus stop; in response, the County painted a crosswalk at the intersection. Other than bus patrons, few pedestrians used the crosswalk.

Despite the crosswalk, pedestrians still had difficulty finding adequate gaps in traffic during the morning commute. Morning commute traffic on Pacheco was heavy, drivers were relatively inattentive, and the speed limit was often disregarded. In February 1986, Kimberly Chittock was struck by a car while crossing Pacheco midblock to get to the DeNormandie bus stop. The Chittock family filed a claim against CCCTA complaining about the location of the DeNormandie bus stop; CCCTA denied the claim. In the ensuing lawsuit, CCCTA took a deposition in which the Chittocks' traffic expert testified it was unsafe for pedestrians to cross Pacheco at DeNormandie, and the bus stop should have been moved one block west to the intersection at Morello Avenue (Morello), which (although it had a stop sign) should have been controlled with traffic signals.

---

[1] All further statutory references are to the Government Code unless otherwise specified.

One year after Chittock's accident, early in 1987, 15 students complained to CCCTA that it was too dangerous to cross Pacheco at Morello to get to the DeNormandie bus stop. In July 1987, the County installed traffic signal lights, equipped with pedestrian push buttons, at the Pacheco and Morello intersection. CCCTA did not, however, move its bus stop from DeNormandie to Morello.

Although pedestrians could now cross Pacheco safely at Morello, the route to the DeNormandie bus stop along the north shoulder of Pacheco was unnecessarily hazardous. The shoulder was relatively narrow, and the gravel and dirt adjacent to the paved portion could be muddy. Additionally, the area was often occupied by large parked trucks, and in one portion the drainage swale had eroded to within five and a half feet of the edge line. In another area of the north shoulder, pedestrians had to walk in the roadway for several feet. Plaintiff's traffic engineering expert opined that pedestrians trying to get to the DeNormandie bus stop during the morning commute faced unnecessary hazards wherever they crossed, because of the unsafe conditions on the north shoulder of Pacheco and the difficulty of finding safe gaps in traffic to cross Pacheco without a signal. As a matter of bus patron safety, the DeNormandie bus stop should have been moved one block west to Morello.

Plaintiff Bonanno lives with members of her family on Robinsdale Road, south of Pacheco. At the time of the accident, she relied on public transportation, including a CCCTA bus she took to her job cleaning rooms at the Motel 6 in Walnut Creek. On November 16, 1993, around 7:00 a.m., walking to the bus stop at DeNormandie, Bonanno attempted to cross Pacheco at the DeNormandie intersection. She waited on the curb for some minutes for a break in traffic, but a car passed every few seconds. Finally, eastbound motorist Jennifer Kimberly stopped at the crosswalk to let Bonanno cross. After further waiting, a westbound motorist stopped as well.

Jeremy McLain was driving eastbound on Pacheco on his way to work. He was having difficulty seeing out of his frost-covered windshield with the bright morning sun ahead. As Bonanno stepped out into the crosswalk and walked in front of Kimberly's car, McLain rear-ended Kimberly's car (which he had not seen), causing it to lurch forward and hit Bonanno, who was seriously injured.

Because the County owns the right-of-way along Pacheco, CCCTA had to obtain the County's permission to move a bus stop or install a new stop. Before plaintiff's accident, CCCTA had never requested addition of a stop at

Morello. After the accident, CCCTA's representative met with the County's traffic engineer and requested a stop be added at Morello. The engineer and the County Board of Supervisors approved the request, and the stop was added.

Bonanno sued CCCTA, the County, McLain, and Kaiser Foundation Hospitals and related entities, where she had been treated after the accident. Eventually, all defendants except CCCTA settled, and in 1999 Bonanno tried her case against CCCTA alone. The jury returned its verdict in her favor, expressly finding that the bus stop was a dangerous condition of public property. The jury found McLain 88 percent responsible, Kaiser Hospital 10 percent responsible, and the County and CCCTA each 1 percent responsible. The trial court entered judgment for Bonanno and against CCCTA, on Bonanno's cause of action for a dangerous condition of public property, in the amounts of $1,591,130 in economic damages (reflecting credits for prior settlements) and $15,000 in noneconomic damages (1 percent of the total noneconomic damage award).

The Court of Appeal affirmed, holding that the *location* of the DeNormandie stop created a dangerous condition in that it "beckoned pedestrian bus patrons to cross, and compelled cars to stop, at the feeder crosswalk without attendant traffic lights or pedestrian-activated signals." ▮▮▮ We granted review on CCCTA's petition, limiting review to the question "whether the location of a bus stop may constitute a dangerous condition of public property under Government Code section 830 because bus patrons will be enticed to cross a dangerous crosswalk to reach the bus stop."

ANALYSIS

Under section 835, a public entity such as CCCTA is "liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and [that]: [¶] . . . [¶] (b) [t]he public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." At this stage of the proceedings, the only element at issue is the existence of a dangerous condition of the property.

Our decision here, we emphasize, does not concern the question whether the crosswalk at DeNormandie was in fact an unsafe pedestrian route for crossing Pacheco, or even the broader question whether painted crosswalks

at uncontrolled intersections are more dangerous than those at signal-controlled intersections. As the County, which controlled the intersection, settled with plaintiff before trial, our decision does not in any respect address the liability of a city or county for maintenance of an unsafe crosswalk. To be sure, plaintiff introduced evidence—which the jury apparently found persuasive—showing the DeNormandie crossing was more dangerous than that at Morello, in order to establish that CCCTA should have moved its bus stop to Morello. But the sufficiency of that evidence is not before this court. Our order limiting review, quoted earlier in this opinion, assumes the existence of a dangerous crosswalk, posing only the question whether a *bus stop* may be deemed dangerous because bus users, to reach the stop, must cross at that dangerous crosswalk.

Nor are we primarily concerned here with the sufficiency of evidence to show that CCCTA controlled the location of its bus stop, although part of the plaintiff's burden in an action under section 835 is, of course, to show that the public entity owned or controlled the property subject to the dangerous condition. (See § 830, subd. (c).) CCCTA devotes only one paragraph of its briefing to this issue, noting that the process of installing a bus stop on County property involves consultation between CCCTA and the County, with the County enjoying a veto power over any proposal for a new stop on its property. But that CCCTA needed the County's permission to place a stop at Morello does not preclude, as a matter of law, CCCTA's potential liability for risks arising from the stop's location, as the record contains no evidence CCCTA had asked for such permission and been refused, or had any reason to assume permission would be denied. (See *Warden v. City of Los Angeles* (1975) 13 Cal.3d 297, 300-301 [118 Cal.Rptr. 487, 530 P.2d 175] [city, which never applied to Coast Guard for more effective warning buoys on sewer outfall pipe, could not avoid liability for pipe's latent danger on the ground the Coast Guard controlled aids to navigation]; *Shea v. City of San Bernardino* (1936) 7 Cal.2d 688, 692-693 [62 P.2d 365] [city had duty to request that railroad commission correct a defective grade crossing on city street].) In fact, when, after plaintiff's accident, CCCTA asked that a bus stop be added at Morello, the County approved the request.[2]

■ A "dangerous condition," as defined in section 830, is "a condition of property that creates a substantial . . . risk of injury when such property or adjacent property is used with due care" in a "reasonably foreseeable" manner. (§ 830, subd. (a).) A California Law Revision Commission comment accompanying the statute's 1963 enactment expands on the relationship between public property and adjacent property with regard to dangerous

---

[2]In any event, CCCTA enjoyed sufficient sole control over the bus stop to *remove* it if it was unnecessarily dangerous.

conditions: " 'Adjacent property' as used in the definition of 'dangerous condition' refers to the area that is exposed to the risk created by a dangerous condition of the public property. . . . [¶] . . . A public entity may be liable only for dangerous conditions of its own property. But its own property may be considered dangerous if it creates a substantial risk of injury to adjacent property or to persons on adjacent property; and its own property may be considered dangerous if a condition on the adjacent property exposes those using the public property to a substantial risk of injury." (Cal. Law Revision Com. com., reprinted at 32 West's Ann. Gov. Code (1995 ed.) foll. § 830, p. 299.)

■ The existence of a dangerous condition is ordinarily a question of fact—resolved here by the jury's express finding that the bus stop was a dangerous condition of CCCTA's property—but it can be decided as a matter of law if reasonable minds can come to only one conclusion. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1133 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) The statutory language neither precludes nor expressly endorses plaintiff's theory that the bus stop was dangerous because accessing it required crossing a dangerous intersection. The Law Revision Commission comment, however, does endorse that theory: the DeNormandie bus stop may properly be considered dangerous under section 830 in that, in the words of the Law Revision Commission, "a condition on the adjacent property [the crosswalk at an uncontrolled intersection] exposes those using the public property [the bus stop] to a substantial risk of injury." (Cal. Law Revision Com. com., reprinted at 32 West's Ann. Gov. Code, *supra*, foll. § 830, p. 299.) ■ Because the official comments of the California Law Revision Commission "are declarative of the intent not only of the draftsman of the code but also of the legislators who subsequently enacted it" (*People v. Williams* (1976) 16 Cal.3d 663, 667-668 [128 Cal.Rptr. 888, 547 P.2d 1000]), the comments are persuasive, albeit not conclusive, evidence of that intent (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 542 [110 Cal.Rptr.2d 412, 28 P.3d 151]). We must determine, therefore, whether some indication of legislative intent beyond the statutory language and Law Revision Commission comment, or some other principle established in the California cases, negates the jury's finding as a matter of law. After examining the relevant case law, we find no such contrary principle of law.

■ Most obviously, a dangerous condition exists when public property is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself. (2 Van Alstyne et al., Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th ed. 2002) Dangerous Condition of Public Property, § 12.17, pp. 768-769; see, e.g., *Mathews v.*

*State of California ex rel. Dept. of Transportation* (1978) 82 Cal.App.3d 116, 120 [145 Cal.Rptr. 443] [street intersection with malfunctioning traffic signals]; *De La Rosa v. City of San Bernardino* (1971) 16 Cal.App.3d 739, 745-746 [94 Cal.Rptr. 175] [stop sign obscured by roadside plantings].) But public property has also been considered to be in a dangerous condition "because of the design or *location* of the improvement, the interrelationship of its structural or natural features, or the presence of latent hazards associated with its normal use." (Van Alstyne, *supra*, § 12.18, p. 769, italics added.)

That the location of a public improvement or, more broadly, its relationship to its surroundings, may create dangers to users is by no means a novel idea. In *Warden v. City of Los Angeles, supra,* 13 Cal.3d 297, the public property at issue was a sewage outfall pipe in Santa Monica Bay. Though, as far as our decision reveals, the pipe was not damaged, deteriorated or defective in any way, this court agreed its *location*, near the water's surface in an area frequented by ships, constituted a dangerous condition: "Indeed the record is clear that the city placed the pipe near the surface although it could have submerged it for safety purposes, as was done with other installations. This created the dangerous condition which invokes liability under section 835, subdivision (a)." (*Id.* at p. 300.)

More specifically, the Courts of Appeal have, consistent with the Law Revision Commission comment, recognized that hazards present on adjoining property may create a dangerous condition of public property when users of the public property are necessarily exposed to those risks. Thus, in *Holmes v. City of Oakland* (1968) 260 Cal.App.2d 378 [67 Cal.Rptr. 197] (*Holmes*), the plaintiff child was hit by a Santa Fe railroad train running on a right-of-way along a city street. The plaintiff alleged the street was in a dangerous condition because of the tracks running along it, which children from the nearby grammar school had to cross on their way home from school. (*Id.* at p. 381.) The appellate court held that even if the city did not control the operation of trains on the right-of-way, the complaint alleged a cause of action for maintenance of public property in a dangerous condition, under section 835, because "a condition on the adjacent right-of-way exposes those using the public property to a substantial risk of injury." (*Id.* at p. 389; see *id.* at pp. 389-390 [quoting and relying on Cal. Law Revision Com. com. to § 830].) The dangerous condition, in other words, was the adjacency of the street and the railroad right-of-way.

*Branzel v. City of Concord* (1966) 247 Cal.App.2d 68 [55 Cal.Rptr. 167] (*Branzel*) contains an extensive treatment of the question. A father was

electrocuted when his son's model airplane escaped the son's grasp as he was flying it in the city's designated model airplane park; chasing after it, the father caught the plane's guide wire just as it came in contact with uninsulated electrical lines across the street from the park. (*Id.* at pp. 69-71.) The defendant city contended that, as a matter of law, there was no dangerous or defective condition of its property (the park). The appellate court rejected that claim, holding the jury could find it foreseeable that users of the model airplane field would sometimes lose control of their planes and, in trying to recover them, would be exposed to the danger of the electrical lines. "While the City did not maintain or control the power lines, it did maintain the flying field in a location so close to them that in the light of the known use of the field the involvement of the field with the lines could be reasonably anticipated. It seems to us . . . that the condition of the field can be considered dangerous because the condition of the adjacent power lines exposed those using the field to a substantial risk of injury." (*Id.* at p. 75; see also *Jordan v. City of Long Beach* (1971) 17 Cal.App.3d 878, 881-883 [95 Cal.Rptr. 246] (*Jordan*) [defective pavement with protruding water pipe on private property adjoining public sidewalk was dangerous condition of sidewalk because it exposed sidewalk users to substantial risk of injury]; *Dudum v. City of San Mateo* (1959) 167 Cal.App.2d 593, 597 [334 P.2d 968] [location of stop sign was dangerous condition because it caused sign to be obscured by tree on adjacent private property]; *Marsh v. City of Sacramento* (1954) 127 Cal.App.2d 721, 724 [274 P.2d 434] [sidewalk, not defective in itself, nonetheless could constitute dangerous condition by virtue of the demolition of an adjacent building, which left an eight-foot drop-off at sidewalk's edge]; *Bauman v. San Francisco* (1940) 42 Cal.App.2d 144, 153 [108 P.2d 989] (*Bauman*) [playground area for small children constituted dangerous condition of public property because of proximity to field used for "hard baseball"].)[3]

---

[3]*Bauman* also held that "[t]he very fact that plaintiff was injured while playing in the sand box . . . is some evidence" of a dangerous condition (*Bauman, supra,* 42 Cal.App.2d at p. 154), but that holding has been abrogated by enactment of section 830.5, subdivision (a). (See *Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 831 [15 Cal.Rptr.2d 679, 843 P.2d 624].) This did not affect the court's holding that a jury could find a dangerous condition in "the playing of hard baseball in dangerous proximity to the sand box." (*Bauman, supra,* at p. 153.)

Because *Branzel* and *Bauman* were decided under predecessor statutes to section 835 (*Branzel* under Gov. Code, former § 53051; *Bauman* under § 2 of the Public Liability Act of 1923 before its codification as Gov. Code, former § 53051), CCCTA maintains the courts' decisions "would not be the same today." But both former laws, like section 835, imposed liability for a "dangerous . . . condition" of public property. (*Branzel, supra,* 247 Cal.App.2d at p. 71; *Bauman, supra,* 42 Cal.App.2d at p. 148.) The *Branzel* court, moreover, noted that the 1963 passage of the California Tort Claims Act, of which sections 830 and 835 are parts, made "no material changes in the law applicable to the facts now before us," and quoted, in

We therefore reject CCCTA's contention that it cannot be liable for an injury occurring on property (the street) it neither owned nor controlled. CCCTA owned and controlled its own bus stop, and a condition of *that* property, its physical situation, caused users of the bus stop to be at risk from the immediately adjacent property, just as the model airplane flyers were at risk from the adjacent power lines in *Branzel, supra,* 247 Cal.App.2d 68; users of the city street were at risk from the adjacent railroad right-of-way in *Holmes, supra,* 260 Cal.App.2d 378; those walking on the public sidewalk were at risk from the defective pavement and protruding pipe on adjacent private property in *Jordan, supra,* 17 Cal.App.3d 878; and children using the play area were at risk from the adjacent baseball games in *Bauman, supra,* 42 Cal.App.2d 144.[4]

Nor is it determinative that Bonanno's injury occurred on adjacent County property as she approached the bus stop, rather than while she was awaiting the bus at the stop itself. In the circumstances, that Bonanno was injured trying to access CCCTA's property makes her no less a user of it. If a CCCTA bus stop could be reached only by jumping across an adjacent ditch, CCCTA would logically bear the same liability to a patron who fell into the ditch attempting to reach the stop as to one who fell while waiting at the stop. Several Court of Appeal decisions applying section 835 and its statutory predecessor have, like the present case, involved injuries to users of public property that occurred on adjacent private property. (See *Jordan, supra,* 17 Cal.App.3d at p. 881 [injury-causing pavement defect located about 12 inches from public property]; *Holmes, supra,* 260 Cal.App.2d at p. 390 [finding no precedential support for the proposition that "the injury must occur on the public property in order for liability to attach"]; *Branzel, supra,* 247 Cal.App.2d at p. 71 [decedent electrocuted across the street from city park].)

support of its conclusion on the merits, the Law Revision Commission comment to section 830. (*Branzel, supra,* at p. 73, fn. 6.) *Branzel* and *Bauman* thus speak to the meaning of "dangerous condition" under sections 830 and 835 as well as under prior law.

[4] Justice Baxter's dissenting opinion misapprehends the basis for liability in this case. Plaintiff's theory, which the jury accepted and we find legally tenable, was that placing the bus stop at the intersection of Pacheco and DeNormandie created a dangerous condition because the stop could, at that location, only be reached from the south side of Pacheco by one of two approaches (the crosswalk and the narrow north shoulder of Pacheco), *both of which* were unnecessarily unsafe. Plaintiff did not and does not claim CCCTA should be held liable simply for locating a transit stop near a crosswalk or on a busy street. The principle at work—amply established in the above cited decisions—is not that property owners must "ensure the safety of all persons who encounter nearby traffic-related hazards in reaching their property" (dis. opn. of Baxter, J., *post,* at p. 158), but that public entities are subject to potential liability (not as insurers but for their own negligence, and not as a matter of common law but by mandate of sections 830 and 835) when their facilities are located in physical situations that unnecessarily increase the danger to those who, exercising due care themselves, use the facilities in a reasonably foreseeable manner.

CCCTA cites *Seaber v. Hotel Del Coronado* (1991) 1 Cal.App.4th 481 [2 Cal.Rptr.2d 405], involving an alleged dangerous condition of *private* property, as establishing that a landowner has no duty to remedy or warn of hazards on adjacent property not under the landowner's control. In *Seaber*, the plaintiffs sued a hotel for the death of a pedestrian who, on leaving the hotel, was struck by an automobile in a marked crosswalk adjacent to the hotel's property. The reviewing court held that the hotel, lacking control over the crosswalk on a public street, should not bear the burden of warning pedestrians of the risks posed by its use. (*Id.* at pp. 492-493.) But even assuming public entity liability under section 835 is coextensive with private liability for maintaining property in an unsafe condition, a premise CCCTA does not establish, we agree with the Court of Appeal that the feasibility of moving or removing a bus stop—an option not available to the hotel owners in *Seaber*—distinguishes the present case from *Seaber*. In this sense, as the Court of Appeal observed, the case at bar is closer to those involving *mobile* places of business, such as *Schwartz v. Helms Bakery Limited* (1967) 67 Cal.2d 232 [60 Cal.Rptr. 510, 430 P.2d 68] (bakery truck), than it is to *Seaber*: " ' " 'While the street vendor cannot control traffic on the street around him he can, to a degree, control his own movements, the places where he will do business and, thus, the avenues of approach to it.' " [Citations.]' (*Seaber, supra,* at p. 490.) Similarly, the existence of the bus stop and sign attracted patrons, beckoning them to cross . . . . And, while CCCTA could not control traffic, it did control the location of the bus stop . . . . The solution was to move or eliminate the bus stop, a remedy that imposed no undue burden on CCCTA."

Nor does the fact plaintiff's injury was immediately caused by a third party's negligent or illegal act (here, McLain's negligent driving) render the present case novel. No shortage exists of cases recognizing a dangerous condition of public property in some characteristic of the property that exposed its users to increased danger from third party negligence or criminality. In *Baldwin v. State of California* (1972) 6 Cal.3d 424 [99 Cal.Rptr. 145, 491 P.2d 1121], the asserted dangerous condition was the absence of a left-turn lane at a busy intersection, which allegedly contributed to the plaintiff's automobile accident. We held: "Of course the fact that any negligence by the state would not have resulted in injury to the plaintiff without the additional negligence of the driver who struck him from the rear is no defense to plaintiff's claim against the state." (*Id.* at p. 428, fn. 3.) Again, in *Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 718-719 [159 Cal.Rptr. 835, 602 P.2d 755] (*Ducey*), considering the absence of a median barrier that allegedly would have prevented the injuries that occurred when an out-of-control vehicle crossed a highway median and collided with the

plaintiffs' vehicle, we observed that "the state gains no immunity from liability simply because, in a particular case, the dangerous condition of its property combines with a third party's negligent conduct to inflict injury."[5]

We elaborated on these principles in two cases involving criminal assaults committed on public property. In *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799 [205 Cal.Rptr. 842, 685 P.2d 1193] (*Peterson*), we held that the plaintiff, assaulted while using a public parking lot, properly alleged a dangerous condition of public property by her claim that thick and untrimmed trees and foliage around the lot "permitted the assailant to perpetrate his crime" (*id.* at p. 812). We explained that while third party conduct by itself, "unrelated to the condition of the property" (*id.* at p. 810), does not come within section 835, the public entity may, under some circumstances, be liable under that statute if it maintains its property in a manner that fails "to protect against harmful criminal conduct on its property." (*Peterson, supra,* at p. 811.)

More recently, in *Zelig v. County of Los Angeles, supra,* 27 Cal.4th 1112 (*Zelig*), we rejected the plaintiffs' claim that the county's failure to police its courthouse in such a way as to prevent the decedent's shooting by her former husband constituted a dangerous condition of property under sections 830 and 835. We distinguished cases such as *Peterson, supra,* 36 Cal.3d 799, and *Ducey, supra,* 25 Cal.3d 707, as involving a public entity's duty "to alter the *physical condition of the property* to provide a safeguard against the danger presented by third parties." (*Zelig, supra,* at p. 1139.) The *Zelig* plaintiffs, in contrast, were "unable to point to the manner in which the physical condition of the property should have been altered to prevent the shooting . . . ." (*Id.*

---

[5] See also, e.g., *Swaner v. City of Santa Monica* (1984) 150 Cal.App.3d 789, 804 [198 Cal.Rptr. 208] (lack of barrier between public parking lot and beach was dangerous condition in that it allowed vehicles to drive onto the beach, where they were negligently raced, injuring the plaintiffs, who were sleeping on the beach; "if the third party's negligence or criminal conduct is foreseeable, such third party conduct may be the very risk which makes the public property dangerous when considered in conjunction with some particular feature of the public property"); *Mathews v. State of California ex rel. Dept. of Transportation, supra,* 82 Cal.App.3d at page 121 (dangerous condition [malfunctioning signal] led to accident when third party driver proceeded negligently against the light; "the third party's negligent use does not negate the existence of a dangerous condition"); *Quelvog v. City of Long Beach* (1970) 6 Cal.App.3d 584, 591 [86 Cal.Rptr. 127] (dangerous condition of city sidewalks [accessibility] allowed them to be used by electric "autoettes"; city could not avoid responsibility for pedestrian injuries "upon the ground that it was the duty of the operators to use the vehicles with due care"); *Bauman, supra,* 42 Cal.App.2d at pages 154-155 (negligence of person who organized baseball game on field does not relieve city of responsibility for locating playground area near field used for baseball).

at p. 1140.) Thus, the "risk of injury was not increased or intensified by the condition of the property . . . ." (*Id.* at p. 1137.)[6]

Two points applicable to this case are, therefore, well established: first, that the *location* of public property, by virtue of which users are subjected to hazards on adjacent property, may constitute a "dangerous condition" under sections 830 and 835; second, that a physical condition of the public property that increases the risk of injury from *third party conduct* may be a "dangerous condition" under the statutes. Thus, neither factor provides legal grounds to hold the location of CCCTA's bus stop cannot be a dangerous condition. Nonetheless, the facts of this case prompt fears, articulated in an amici curiae brief from a group of transit districts and other public entities, that by affirming the Court of Appeal we will subject mass transit agencies and other public property owners to broad and unpredictable liability for conditions, including criminal activity, in the neighborhoods surrounding public facilities. Thus, the amici curiae group asks, rhetorically: "[W]ill public entities be required to analyze the placement of entrances on civic buildings to ensure they are positioned nearest a lighted, and purportedly safer, intersection? Must entrances to parking garages, playgrounds, swimming pools, schoolyards, restrooms and other facilities be relocated away from busy streets? Must public agencies avoid offering services in high crime neighborhoods?" Likewise concerned that such wholesale liability for conditions on nearby property not be imposed, contrary to legislative intent, on public entities, we emphasize the limits of our holding in this case.

First, we have addressed in this case only one element of liability under section 835, the existence of a "dangerous condition" of public property. Indeed, we have focused almost exclusively on one aspect of that element, the dangerousness that may arise from the property's location or physical situation. We have not addressed the requirement of a "substantial (as distinguished from a minor, trivial or insignificant) risk of injury" (§ 830, subd. (a)) or, except in broad terms, the necessity of proving the public entity's ownership or control of the dangerous property (*id.*, subd. (c)). Either of these requirements may pose an insuperable burden to a plaintiff claiming the location of public property rendered it dangerous. As to other

---

[6]Justice Brown's dissenting opinion (*post*, at p. 163) observes that in this case the location of CCCTA's bus stop did not increase the risk of injury to users *of the crosswalk*, even if it increased the number of such users. This appears true but irrelevant to the legal analysis. Plaintiff's theory of liability at trial and on appeal was that the location of the bus stop was a dangerous condition of CCCTA's property because it increased the risk to users *of the bus stop*. Although moving the bus stop to Morello or adding a new stop at that intersection would not have made the DeNormandie crosswalk any safer, it would have provided a safer access route for users of CCCTA's property, the bus stop.

elements, a plaintiff seeking to prove liability under section 835 must show, in addition, that the dangerous condition proximately caused his or her injury; that the condition created a reasonably foreseeable risk of the type of injury that was actually incurred; and that the public entity either created the dangerous condition through a negligent or wrongful act or omission of its employee, or had actual or constructive notice of the dangerous condition sufficiently in advance of the accident as to have had time to remedy it. (§ 835.) We reiterate, moreover, the limitation we stated in *Zelig*: public liability lies under section 835 only when a feature of the public property has "increased or intensified" the danger to users from third party conduct. (*Zelig, supra*, 27 Cal.4th at p. 1137.) Thus, the mere fact that users of a government facility bear some risk of being injured in an automobile accident, criminally assaulted, or otherwise injured by a third party on their way to or from the facility does not lead to government liability under section 835.

■ Nor does our proposed holding subject public entities to broad liability for the placement of entrances to public facilities or any other aspects of their *design* that might affect the safety of the facilities' users. Even assuming a public entity had notice that a condition on property adjacent to its facility's entrance made access from that point particularly dangerous to users, a plaintiff suing on this ground would have to overcome the general statutory immunity public entities enjoy from liability for injuries arising from discretionary choices regarding a facility's "plan or design." (§ 830.6.) Other statutory immunities, such as those for injuries caused by the natural condition of unimproved public property (§ 831.2), injuries caused by the condition of an unpaved trail or recreational access road (§ 831.4), and injuries arising out of a hazardous recreational activity (§ 831.7), may also apply to certain claims that public property is in a dangerous condition because of its location. Unless barred by statute, the public entity defendant may also claim any other defense available to a private defendant, such as comparative fault. (§ 815, subd. (b).)

■ Finally, our holding does not suggest public agencies must, to avoid liability for crimes committed against their facilities' users, refrain from offering services in high-crime neighborhoods. Liability under section 835 is limited by section 835.4, which provides, inter alia, that a public entity's creation or maintenance of a dangerous condition does not render the entity liable if the act or omission creating the danger, or the measures taken to protect against it, were reasonable. The reasonableness of such act or omission is judged "by weighing the probability and gravity of potential [foreseeable] injury . . . against the practicality and cost" of acting so as not

to create, or to better protect against, the risk of injury. (§ 835.4.) In its official comment to section 835.4, the Law Revision Commission explained that "[u]nlike private enterprise, a public entity often cannot weigh the advantage of engaging in an activity against the cost and decide not to engage in it. Government cannot 'go out of the business' of governing." (Cal. Law Revision Com. com., reprinted at 32 West's Ann. Gov. Code, *supra*, foll. § 835.4, p. 434.) Under section 835.4, therefore, the reasonableness of a public entity's creation or maintenance of a dangerous condition of its property must be balanced against the costs and benefits of *alternative means of providing the public service*, not against the alternative of *discontinuing* the public service. Even assuming, therefore, that a transit agency's bus or train stop were deemed in a "dangerous condition" because of criminal activity in the surrounding neighborhood (which, again, would require that the location or other characteristics of the stop increased the danger to transit users) or, as here, in a location dangerous to access, the transit agency would not be liable for third party injuries to transit users if the only practical alternative to maintaining the stop at the dangerous site was discontinuing service to the neighborhood.

## CONCLUSION

 The jury in this case expressly found the DeNormandie bus stop to be a dangerous condition of CCCTA's property. Neither that the danger to users of the bus stop arose out of conditions on adjacent property, nor that the injury was caused in part by third party conduct, renders that finding incorrect as a matter of law. Liability of public entities is set by statute, not common law, and we are confident that upholding the jury verdict here will not expand the potential liability of transit districts and other public entities beyond that already recognized by statute. Any *contraction* in the scope of such liability must come from the Legislature.

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Chin, J., and Moreno, J., concurred.

**BAXTER, J.,** Dissenting.—The majority opinion affirms a judgment in favor of plaintiff Darlene Bonanno, who was injured while using a marked crosswalk on a busy street to get to a bus stop maintained by defendant Central Contra Costa Transit Authority (CCCTA). CCCTA neither owned nor controlled the street or the crosswalk where the injury occurred. Nonetheless, the majority concludes that CCCTA was properly found liable

because its bus stop's *location* constituted a dangerous condition of property that caused bus patrons to be at risk from the immediately adjacent street and crosswalk.

I dissent because the majority's holding disregards firmly established law that a property owner is not liable for injuries caused when a person is hit by a vehicle while crossing an adjacent public street to go to or from the property when the owner has no right of control over the street or the vehicles thereon. (*Seaber v. Hotel Del Coronado* (1991) 1 Cal.App.4th 481 [2 Cal.Rptr.2d 405] [private hotel owner not liable for the death of a hotel patron who was struck on an adjacent highway while using a marked pedestrian crosswalk that had been installed at the hotel's request]; *Nevarez v. Thriftimart, Inc.* (1970) 7 Cal.App.3d 799 [87 Cal.Rptr. 50] [private store owner not liable for injuries suffered by a child who was struck by a car as he ran from the store's parking lot carnival, which had featured a merry-go-round and free ice cream, to his home across the street]; *Avey v. County of Santa Clara* (1968) 257 Cal.App.2d 708 [65 Cal.Rptr. 181] [even where city and county defendants had notice that children waiting at a school bus stop would sometimes run over an adjacent state-owned highway, as well as defendants' own parallel street next to the highway, to go to and from a store across from the bus stop for treats, defendants were not liable when a child engaging in such activity was hit and killed on the state-owned highway].)

The authorities the majority relies on for its extraordinary "location as a dangerous condition" theory of liability are inapposite. None of them involved property deemed to be defective or in a dangerous condition because of adjacency to a busy public street. (E.g., *Warden v. City of Los Angeles* (1975) 13 Cal.3d 297 [118 Cal.Rptr. 487, 530 P.2d 175] [city's sewer pipe constituted a dangerous condition because of its location just under water's surface]; *Jordan v. City of Long Beach* (1971) 17 Cal.App.3d 878 [95 Cal.Rptr. 246] [city sidewalk could be a dangerous condition because of adjacent defective pavement on private property with protruding water pipe]; *Holmes v. City of Oakland* (1968) 260 Cal.App.2d 378 [67 Cal.Rptr. 197] [dangerous condition of city property could be found where exposed and unguarded railroad tracks located on a city street were in close proximity to a school]; *Branzel v. City of Concord* (1966) 247 Cal.App.2d 68 [55 Cal.Rptr. 167] [city's model airplane field presented a dangerous condition because of its adjacency to power lines]; *Dudum v. City of San Mateo* (1959) 167 Cal.App.2d 593 [334 P.2d 968] [stop sign obscured by tree on adjacent private property could be a dangerous condition]; *Marsh v. City of Sacramento* (1954) 127 Cal.App.2d 721 [274 P.2d 434] [sidewalk properly found dangerous due to eight-foot drop-off at its edge caused by demolition of

adjacent building]; *Bauman v. San Francisco* (1940) 42 Cal.App.2d 144 [108 P.2d 989] [playground was dangerous due to its proximity to baseball field].) Those decisions had no occasion to consider the principle that the public entity liability statutes were "not enacted for the purpose of protecting those who come upon city streets, but only those who sustain injuries by reason of a 'dangerous or defective' condition." (*Perry v. City of Santa Monica* (1955) 130 Cal.App.2d 370, 372 [279 P.2d 92] [decided in the context of the Public Liability Act of 1923].)

Moreover, the majority's holding results in an anomaly that is obvious and troubling. Section 830.4 of the Government Code[1] provides that "[a] condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code . . . ." Therefore, even though crosswalks lacking traffic control signals or stop signs could not be deemed dangerous conditions for purposes of the California Tort Claims Act, the majority finds that the properties adjacent to those crosswalks may be considered dangerous or defective where persons are injured while using those crosswalks to get to and from the properties.

I disagree. If a plaintiff injured while using a crosswalk on a busy street is unable, as a matter of law, to pursue a *direct* theory of recovery against the public entity that maintained control over that particular street and crosswalk, it follows that the plaintiff should not be permitted to pursue and prevail on an *indirect* theory of recovery against the adjacent landowner whose property merely served as the plaintiff's destination. In my view, owners and occupiers of property should not be made to ensure the safety of all persons who encounter nearby traffic-related hazards in reaching their property.[2]

The majority purports to limit its unsupported expansion of the dangerous condition concept by suggesting that liability of a defendant would depend upon the feasibility of moving or removing its service or business elsewhere from the dangerous location. I find such reasoning illogical and prone to results that are inconsistent and unfair as between similarly situated plaintiffs and defendants.

Consider the following hypothetical. A public entity owns a building, with two spaces for rent, located directly adjacent to a crosswalk on a busy street.

---

[1]All further statutory references are to the Government Code unless otherwise indicated.

[2]Nonowner occupiers and possessors of property also may be subject to liability for defective or dangerous property conditions. (See, e.g., *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

One of the building's renters is subject to a two-year lease; the other rents on a month-to-month basis. Like the situation here, there are no traffic lights or stop signs at the crosswalk, and the building's location therefore presents a dangerous condition. Three persons—A, B, and C—simultaneously step into the crosswalk to get to the building: A seeks to visit the two-year lessee; B seeks to visit the other renter, and C has a meeting with the building owner on the premises. Although cars stop to allow A, B, and C to cross the street, an inattentive driver crashes into one of the stopped cars and causes injuries to A, B, and C. Under the majority's rule, the public entity owner would escape liability because it could not feasibly have moved its building. The month-to-month renter likely would be subject to liability because terminating the tenancy and relocating appears to have been feasible. The two-year lessee might or might not be subject to liability, depending upon a jury's assessment of feasibility. Thus, even though all three defendants appear equally at fault in terms of attracting visitors to the same "dangerous condition"—i.e., their location—they will not be held similarly accountable for their conduct; nor will the three plaintiffs be similarly situated when pursuing recovery for their injuries.

Finally, the majority suggests that the ramifications of its holding are further limited because public entity liability under section 835 is not coextensive with private liability for maintaining property in an unsafe condition. (See maj. opn., *ante*, at p. 152.) I am not so sure. Because the intent of the Califoria Tort Claims Act is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances (see generally 35 pt. 2 Cal.Jur.3d (1988) Government Tort Liability, § 3, p. 16; *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 985 [42 Cal.Rptr.2d 842, 897 P.2d 1320]), the majority's holding would appear to enlarge private liability for dangerous conditions as well.

Today's decision significantly broadens the concept of what may properly constitute a dangerous condition of public property giving rise to liability under section 835. Like Justice Brown, I am deeply concerned that the majority's rule will deplete the already scarce resources of public entities and their taxpayers, for, as was the situation here, a public entity remains on the hook for 100 percent of a plaintiff's economic damages even though it is adjudged to be only 1 percent at fault. And though the majority purports to suggest otherwise, its rule may well directly subject owners and occupiers of private property, especially smaller businesses that rent but cannot afford to own, to uncertain and disproportional liability as well. For all of the foregoing reasons, I dissent.

**BROWN, J.,** Dissenting.—Reading the majority opinion is painful, like watching a traffic accident in slow motion, because the majority's misguided effort to compensate the victim of this accident will, quite foreseeably, victimize everyone else who is dependent on public transit.

The California Tort Claims Act "provides that a public entity is not liable for an injury '[e]xcept as otherwise provided by statute . . . .' (Gov. Code, § 815.) Certain statutes do provide expressly for public entity liability in circumstances that are somewhat parallel to the potential liability of private individuals and entities but, as past cases have explained, ' "[T]he intent of the [Tort Claims Act] is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances . . . ." ' (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 829 [15 Cal.Rptr.2d 679, 843 P.2d 624].)" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1127-1128 [119 Cal.Rptr.2d 709, 45 P.3d 1171] (*Zelig*).)

In California, then, governmental immunity is the rule, and liability is the exception. (*Trinkle v. California State Lottery* (1999) 71 Cal.App.4th 1198, 1202 [84 Cal.Rptr.2d 496]; *Amylou R. v. County of Riverside* (1994) 28 Cal.App.4th 1205, 1213 [34 Cal.Rptr.2d 319]; *Thompson v. City of Lake Elsinore* (1993) 18 Cal.App.4th 49, 63 [22 Cal.Rptr.2d 344].) The dangerous condition of public property exception to the general rule of governmental immunity is set forth in Government Code section 835. That section provides in pertinent part that "a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that . . . [¶] . . . [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (*Ibid.*)

*Zelig, supra,* 27 Cal.4th 1112, demonstrates just how rigidly Government Code section 835 delineates the circumstances that confine a public entity's liability for a dangerous condition of its property. In *Zelig,* the plaintiffs were the minor children of a woman who was shot to death by her former husband in a Los Angeles County courthouse where she was awaiting a hearing regarding spousal and child support. On several occasions prior to the killing, the decedent had informed a bailiff that she was afraid her former husband might attack or kill her in the courthouse, and she had also

previously provided the bailiff and a judge in the family court with copies of letters in which he threatened to kill her. (*Zelig*, at p. 1119.) The plaintiffs sued the county on the ground, among others, that it maintained the courthouse in a dangerous condition because it did not have metal detectors or other safety measures to prevent the introduction of firearms. (*Id.* at p. 1121.) We reversed the judgment of the Court Appeal and remanded the matter to that court with directions to affirm the judgment entered by the trial court in favor of the defendants. (*Id.* at p. 1150.)

In *Zelig*, we emphasized that "liability is imposed only when there is some defect in the property itself and a causal connection is established between the defect and the injury. In many cases, courts have rejected the claim that an injury caused by the criminal activity of a third person was attributable to a dangerous condition of the property within the meaning of Government Code section 835, because the claims lacked an adequate showing that the *property itself* was in a defective condition." (*Zelig*, *supra*, 27 Cal.4th at p. 1135.) In *Zelig*, we concluded, "the risk of injury was not increased or intensified by the condition of the property, and the necessary causal connection between the condition of the property and [the] crime was not present. Indeed, the risk of injury to [the victim] at the hands of her ex-husband was at least as great outside the courthouse." (*Id.* at p. 1137.) In any event, we noted, "plaintiffs are unable to point to any defective aspect of the purely physical condition of the property." (*Id.* at p. 1139.)

In this case, plaintiff's dangerous condition of public property claim suffers from the same defects that defeated the claim in *Zelig*. That is, plaintiff is unable to point to any defective aspect of the "purely physical condition" of the bus stop. (*Zelig*, *supra*, 27 Cal.4th at p. 1139.) Moreover, "the risk of injury was not increased or intensified by the condition" of the bus stop, and the "necessary causal connection between the condition" of the bus stop and the negligent driver's failure to stop at the crosswalk was not shown. (*Id.* at p. 1137.)

Contra Costa County (County) painted the crosswalk for the safety of pedestrians crossing the street in order to reach the bus stop. On this tragic occasion, the crosswalk actually functioned as it was intended to, that is, cars coming from both directions stopped for plaintiff. (Maj. opn., *ante*, at p. 145.)[1] Plaintiff was injured, not because of any defective aspect of the purely physical condition of public property owned or controlled by the County (the

---

[1] Admittedly, plaintiff had to wait awhile before pedestrian-friendly motorists honored the crosswalk, creating a traffic break for her, but, sadly, that seems to be true of most crosswalks in this imperfect world. Indeed, pedestrians who cross on the green at stop-lighted intersec-

street) or Central Contra Costa Transit Authority (CCCTA) (the bus stop), but because another motorist rear-ended one of the stopped cars, causing it to lurch forward and hit plaintiff. The accident occurred because the driver "was having difficulty seeing out of his frost-covered windshield with the bright morning sun ahead." (*Ibid.*) Just as the "risk of injury to the [victim in *Zelig*] at the hands of her ex-husband was at least as great outside the courthouse" (*Zelig, supra,* 27 Cal.4th at p. 1137), the tragic accident in this case might, so far as the evidence shows, just as well have happened at any other crosswalk along that stretch of road, or even at the stop-lighted intersection a block farther along. Indeed, the fact that the accident occurred at a crosswalk, rather than a stoplight, was itself quite accidental. As the majority observes, "[m]orning commute traffic on Pacheco was heavy, drivers were relatively inattentive, and the speed limit was often disregarded." (Maj. opn., *ante,* at p. 144.) Much the same could be said of most suburban arterials. Moving the bus stop one block to the stop-lighted intersection would not have changed those conditions. Then why should the bus company be held responsible for the negligence of the driver? "Government cannot guarantee that roadways will not be used by defective cars or careless drivers." (*Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 724 [159 Cal.Rptr. 835, 602 P.2d 755] (conc. & dis. opn. of Clark, J.).)

In the course of holding that the location of a bus stop may constitute a dangerous condition of public property within the meaning of Government Code section 835, the majority asserts "[t]hat the location of a public improvement or, more broadly, its relationship to its surroundings, may create dangers to users is by no means a novel idea." (Maj. opn., *ante,* at p. 149.) In support of this assertion, the majority cites a single decision of this court—*Warden v. City of Los Angeles* (1975) 13 Cal.3d 297 [118 Cal.Rptr. 487, 530 P.2d 175] (*Warden*). (Maj. opn., *ante,* at p. 149.) *Warden,* however, is easily distinguished.

In *Warden,* a plaintiff who suffered personal injuries and property damage resulting from a collision of his sailboat with a submerged sewer pipe in Santa Monica Bay sued the City of Los Angeles for maintaining the pipe in a dangerous condition. The sewer pipe was one of four constructed and maintained in the bay by the city as outfalls for the city's Hyperion Sewage Treatment Plant. Three of the pipes were buried under the seabed, but the pipe involved in the accident protruded into bay waters and was only 2.2 feet below the surface at low tide. Long after this pipe was constructed, but well before the accident, small boat traffic in the vicinity increased significantly

tions without first making sure that approaching cars are going to actually stop are proceeding at considerable peril. That is not the way things should be, but it is the way things are.

because a nearby marina began operations. Nevertheless, and despite the fact that three small boats had struck this pipe several years earlier, it was marked only by two unlighted buoys and it had no sounding device. The city did not deny the pipe posed a hazard or that it was aware of the danger created thereby. (*Warden, supra,* 13 Cal.3d at p. 300.) However, the city contended it had met its responsibilities when "it merely 'asked' a representative [of the Coast Guard] as to 'current Coast Guard thinking' on the marking of the pipe and 'the advisability' of adding lights or whistles to the existing buoys." (*Id.* at p. 301, fn. omitted.) This court rejected that argument, holding the city was at fault for having failed to make any affirmative request to the Coast Guard for authorization to place lights or audible signals on the buoys marking the pipe. (*Ibid.*)

*Warden* is simply inapposite. It might be apposite if, for example, plaintiff had injured herself by striking her head on a low CCCTA bus sign while walking on a city sidewalk. However, that is not what happened here.

Even assuming arguendo that the location of a bus stop may constitute a dangerous condition of public property within the meaning of Government Code section 835, the location of this bus stop may have increased the number of persons using the crosswalk, but it did not increase or intensify the risk that pedestrians using the crosswalk would be hit by negligent drivers. As the amici curiae brief filed by the San Mateo County Transit District and more than 200 other public entities observed, "Nothing about the bus stop made it dangerous to use the crosswalk. Rather, the crosswalk was equally safe or dangerous no matter where the bus stop was located. . . . Moving the bus stop, of course, would do nothing to remedy any danger in using the crosswalk . . . . In sum, the bus stop merely presented a reason to use the crosswalk; it did not create or increase any danger there."

Moreover, as the San Mateo County Transit District amici curiae brief observed, "whether an injured person can sue for damages for injuries allegedly caused by a dangerous condition of public property does not and should not depend on his or her destination. Conversely, whether a public entity's property was an injured person's destination should not determine its liability. Recovery for injuries sustained by persons otherwise similarly situated—exposed to the identical danger—should not turn on where they are going next."

The reason trial lawyers seek to expand the tort liability of public agencies is clear: Taxpayers will foot the bill, and taxpayers are assumed to have deep pockets. This case is a perfect example. Although CCCTA was found to be

only 1 percent at fault for this accident, under the doctrine of joint and several liability, judgment was entered against CCCTA for over $1.5 million in economic damages. (Maj. opn., *ante*, at p. 146.) However, the pockets of taxpayers are not bottomless. They never were, and they certainly are not now. The $1,606,130 awarded to plaintiff as damages for an accident for which CCCTA was not at fault, CCCTA, inevitably, must make up by cutting service or raising fares.

The majority's indifference to this, to the real world consequences of its expansive doctrine of public tort liability, is all the more inexcusable now because transit agencies, like other state and local agencies, are in crisis. California, as anyone who has glanced at a newspaper recently knows, faces a budget deficit that may be as high as $35 billion. (See, e.g., Martinez, *The Programmed Disintegration of the Golden Era in the Golden State*, N.Y. Times (Feb. 9, 2003) p. 14.) Even using the Legislative Analyst's more conservative estimate of $26.1 billion, that is $745 each for every man, woman and child in California. Put another way, it is more than a third of the $75 billion the state will spend on all general fund programs—public schools, community colleges, prisons, courts, parks, healthcare for kids and the elderly poor and all the rest. (Editorial, *Counting to $26.1 Billion: The Stakes Behind an Unimaginable Number*, Sacramento Bee (Jan. 19, 2003) p. E4.)

This crisis, of course, affects public transit agencies as well. Take the Bay Area transit agencies, for example: "BART has already had to slash its budget—and raise fares and introduce parking charges—to make up a $60 million budget deficit for the current fiscal year, which ends June 30. And while financial analysts see ridership and sales tax rebounding in the coming fiscal year, the recovery will be slow and BART will still face big budget deficits—estimated at $40 million next year and $734 million over the next 10 years." (Cabanatuan, *BART Dip in Ridership May Force Higher Fares*, S.F. Chronicle (Feb. 14, 2003) p. A23.) "Faced with a $52 million budget shortfall, the San Francisco Municipal Transportation Agency Commission voted Wednesday to increase most [Muni] fares . . . ." (Gordon, *Muni Fare to Increase—To $1.25: No Change for Seniors, Disabled*, S.F. Chronicle (Feb. 27, 2003) p. A17.) "[A]t least 25 percent of Golden Gate Transit bus service will likely be slashed by September as the bridge district attempts to bail itself out of a $202 million deficit over the next five years." (Prado, *Local Officials Reconsidering Transit Tax*, Marin Independent J. (Feb. 20, 2003) p. A1.)

One of the hardest hit agencies is the Santa Clara Valley Transportation Authority (VTA). "The recession, higher operating costs with an expanded

transit system and a drop in ridership have combined to put the VTA in a precarious position. Revenue from sales taxes that makes up nearly 80 percent of the agency's revenue dropped 21 percent last year and continues to slide . . . ." (Richards, *VTA to Slash Service 9%: Buses Will Take a Huge Hit,* S.J. Mercury News (Feb. 7, 2003) p. 1B.) "Last year, the VTA slashed $164 million in spending, cut service, and eliminated more than 300 jobs, 11 percent of its workforce." (*Ibid.*) On top of that, VTA's budget is expected to be cut by 9 percent in April of this year, which will reduce service on 62 of its 72 bus routes, and "[t]he cuts are just a precursor of what's ahead . . . . [The VTA General Manager said] that fares would almost certainly be increased in July and that perhaps even deeper cuts could take place in October or January." (*Ibid.*)

Plaintiff blithely assures this court that moving a bus stop takes only a few hours and costs $4,000. However, plaintiff ignores the fact that there are, according to amicus curiae San Mateo County Transit District, 1,660 other CCCTA bus stops, and that CCCTA will likely feel compelled to conduct a traffic safety analysis of each one of them in order to avoid the liability created by the majority. And CCCTA, of course, will not be uniquely impacted. The beleaguered Santa Clara VTA, for example, has 4,645 bus stops, while the Alameda-Contra Costa Transit District has 8,000!

Moreover, the toll exacted by the majority opinion likely will not be confined to public transit agencies, for the rationale of the decision extends to the location of all public facilities.

It is one thing to impose liability where there is fault; quite another to impose costs by making public utilities guarantors of the safety of everyone who uses public facilities. The logic of this kind of expansive liability in the private sector—that costs can be passed on to consumers and that more efficient and safer producers will prevail in the market—simply cannot be translated to subsidized public services where there is only one provider.

The majority responds that "our proposed holding [does not] subject public entities to broad liability for the placement of entrances to public facilities or any other aspects of their *design* that might affect the safety of the facilities' users." (Maj. opn., *ante,* at p. 155.) The response misses the larger point. The concern is not so much that public entities will be held liable for the placement of the entrances to their public facilities, but that they will be held liable for the placement of the public facilities themselves. Today bus companies are being held liable for the location of their bus stops, tomorrow it will be their bus yards and headquarters buildings. The day after that it will be the location of the courthouse.

Where you stand can depend on where you sit, and, let us be frank, Supreme Court justices don't sit on buses very often. Therefore, the majority would do well to consider the plight of those dependent on WestCAT, the transit agency serving northwestern Contra Costa County. WestCAT, "facing a budget gap of as much as $1.9 million next year, could be forced to raise fares by as much as 75 cents a ride and cut service hours by as much as 36 percent . . . ." (Lochner, *WestCAT Riders Likely Face Fare Hikes, Service Cuts*, West County Times (Mar. 14, 2003) p. A05.) Speaking at a public hearing, WestCAT riders said that higher fares would be difficult for them, but that service cuts would be even worse. (*Ibid.*) " 'Your public transportation, WestCAT, that's my car,' said Barbara Hill, a resident of the county-owned Bayo Vista low-income housing project in Rodeo. [¶] 'I ride it four times a day,' said Hill, an epileptic with spinal problems who uses paratransit to get to the county hospital in Martinez, her doctor in San Pablo, water therapy at the Hilltop YMCA and grocery shopping in Pinole." (*Ibid.*)

Regarding the possibility of service cuts, the majority contents itself with an observation made by the California Law Revision Commission: " 'Government cannot "go out of the business" of governing.' [Citation.]" (Maj. opn., *ante*, at p. 156.)

Tell that to Ms. Hill.