Filed 10/1/13  Keller v. Keller CA2/7
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| RONALD D. KELLER,<br><br>    Plaintiff, Cross-defendant and<br>    Appellant,<br><br>        v.<br><br>LYLE R. KELLER,<br><br>    Defendant, Cross-complainant and<br>    Respondent. | B241757<br><br>(Los Angeles County<br>Super. Ct. No. GC041220) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jan A. Pluim, Judge.  Reversed with directions.

Law Offices of Lowell John Dosch and Lowell John Dosch for Plaintiff, Cross-defendant and Appellant.

Law Offices of Mark J. Warfel and Mark J. Warfel for Defendant, Cross-complainant and Respondent.

_____

# INTRODUCTION

Plaintiff and cross-defendant Ronald D. Keller appeals from a judgment in favor of defendant and cross-complainant Lyle R. Keller. We reverse with directions.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *The Keller Brothers and Their Dispute*[1]

Lyle R. Keller (Lyle) and Ronald D. Keller (Ron) are two of the five sons of George Keller (George).[2] In the 1980's Lyle and Ron were roommates. Lyle was a real estate broker and invested in real estate with Ron and on his own. Lyle provided the financing and Ron worked on the properties. Ron relied on Lyle's expertise as a broker in making the real estate investments.

In late December 1986 and early 1987 Lyle completed the purchase of real property on Merced Avenue in Baldwin Park from George. Lyle gave his father a promissory note and a deed of trust, which were recorded. On February 17, 1987 Lyle executed a quitclaim deed transferring the property to Ron. Handwriting on the deed stated: "This is a [b]onafide [*sic*] gift and the grantor received nothing in return. R&T 11911." Lyle, however, continued to manage the property, leasing it and paying insurance and property taxes on it. Lyle also became executor of George's estate after George died in 1991.

---

[1] The facts are taken from this court's unpublished opinion in the prior appeal in this matter, *Keller v. Keller* (June 16, 2009, B208405), a prior appeal in a probate matter, *Estate of Keller* (April 10, 2002, B152254) [nonpub. opn.], and the parties' stipulated facts submitted in this action on June 10, 2011. (See *People v. Therrian* (2003) 113 Cal.App.4th 609, 611, fn. 4.)

[2] Because Lyle, Ron, and George "share the same last name, we refer to them by their first names for convenience and clarity" (*Jones v. ConocoPhillips Co.* (2011) 198 Cal.App.4th 1187, 1191, fn. 1) and "not out of disrespect" (*Cruz v. Superior Court* (2004) 120 Cal.App.4th 175, 188, fn. 13).

Ron did not record the quitclaim deed when he received it from his brother in 1987 because Lyle asked Ron not to record it. Instead, Ron lost it. Ron erroneously thought Lyle had taken the quitclaim deed when Lyle moved out of Ron's home. When Ron told Lyle in 1987 or 1988 he could not find the quitclaim deed, Lyle told Ron that without the deed, Ron had nothing. Ron did not find the quitclaim deed until March 24, 2006, at which time he promptly recorded it. Ironically, Ron only found the lost deed because Lyle served Ron with written discovery in probate litigation between the two brothers over the estate of their father, which caused Ron to look through old documents and eventually locate the long-lost deed.

B.    *Ron v. Lyle I (the Probate Actions)*

There were two probate actions, one to probate George's estate and one to administer George's trust. In the course of this litigation, Ron successfully removed Lyle as executor of their father's estate and initiated foreclosure proceedings on the Merced Avenue property to collect on the promissory note Lyle had given their father. Ron also successfully set aside an assignment Lyle had made of the promissory note to another brother, George Eugene Keller (known as Gene), also a beneficiary of the estate. In response to Ron's attempt to foreclose, Lyle filed a civil action for declaratory relief and to enjoin the foreclosure, and a petition in the probate action for declaratory relief, injunctive relief, and an accounting. Lyle was able to pay off the note, and on March 11, 2006 the probate court canceled the deed of trust.

C.    *Lyle v. Ron I*

In August 2006 Lyle filed a civil action against Ron, Los Angeles Superior Court case No. BC356629, alleging that Ron had obtained the quitclaim deed from him in 1987 by fraud. Lyle sought cancellation of the quitclaim deed, quiet title as of February 18, 1987 (the date of the quitclaim deed), and injunctive relief to enjoin Ron from interfering with Lyle's ownership, management, and control of the Merced Avenue property. In one of his trial briefs, Lyle argued that at the time of the deed he "was involved in [a] divorce

3

battle since 1981 until several years [*sic*].  To protect his interest from [his] ex-spouse, Lyle executed [the] Quit Claim- [*sic*] in favor of his brother, Ronald, to be kept for his benefit."  Lyle argued that the quitclaim deed "was never intended for the purposes of conveying title of the property from Lyle to Ronald."

In May 2008 the case went to trial, and Lyle lost.  The trial court in that action found that Lyle had failed to prove that Ron procured or obtained the quitclaim deed by fraud.  The trial court entered judgment in favor of Ron on all of Lyle's causes of action. Lyle then moved for a new trial and to reopen the case to add a fourth cause of action for adverse possession.  The trial court denied the motion.  This court, in an unpublished decision, affirmed, holding among other things that Lyle's postjudgment request for leave to amend his complaint to add a cause of action for adverse possession was untimely. (See *Keller v. Keller*, *supra*, B208405.)

D.     *Ron v. Lyle II (This Action)*

On July 28, 2008 Ron filed this action to gain possession of the Merced Avenue property, to obtain information about the property and its tenants, and to recover rents Lyle had collected since March 25, 2006, the day after Ron recorded the quitclaim deed. Ron alleged causes of action for declaratory relief, money damages, constructive trust, a common count for money, an accounting, and injunctive relief.  Lyle filed a cross-complaint that apparently included a cause of action for quiet title by adverse possession.[3]

Lyle lost again.  On April 9, 2010, after a bench trial, the trial court issued a decision in favor of Ron and against Lyle.  The court found that "subsequent to March 24th, 2006 and to the date of October 23, 2008, Lyle has failed to pay all of the property

---

[3]     The record on appeal provided by the parties includes Lyle's opposition to Ron's demurrer to Lyle's cross-complaint (but not Ron's demurrer), the trial court's order overruling Ron's demurrer, Ron's answer to Lyle's cross-complaint, Ron's motion for judgment on the pleadings as to Lyle's cross-complaint (and Lyle's opposition), and Lyle's first amended cross-complaint, but not Lyle's original cross-complaint.

4

taxes, thus he fails on this issue." The court also found that Ron "did not have a recorded title to the property until March the 24th, 2006, thus Lyle did not have an adverse claim until some five year period after March the 24th, 2006." The court did not address Ron's argument that Lyle's cause of action for adverse possession was barred by res judicata because it could have been litigated in the prior civil action between the brothers. The court indicated it would enter judgment in favor of Ron on Lyle's cross-complaint and instructed counsel for Ron to prepare a judgment.

Before the trial court entered a formal judgment, Lyle filed a motion to vacate the judgment and substitute a different judgment. On May 20, 2010 the court entered judgment awarding Ron $15,000 plus interest and awarding Lyle nothing on his cross-complaint. On June 4, 2010 the trial court entered the judgment again, correcting a typographical error.

The trial court heard Lyle's motion to vacate the judgment on June 10, 2010. The court vacated the judgment and ordered a new trial on Lyle's cross-complaint only. The trial court explained that it had been "under the impression at the first trial that the law required that the person that is seeking title by adverse possession had to show the terms of adverse possession for the five years prior to the filing of the complaint—in this case the cross-complaint—which was on October 23rd, 2008. . . . Cases have been brought to the court's attention now . . . that the court may have been wrong," and that "the five-year period could be any five-year period prior to the filing of the complaint as long as it's a continuous period of that five years." The court stated: "I must say I—it strikes me as odd that that, in fact, is the law, but that may very well be the law, that the person that is seeking title by adverse possession ought to file it at the first date that they can in order to put on notice all parties that they are seeking title by adverse possession and not wait until 2008 and then come back before the court and say, well, we're talking about some period of five years [beginning] in '86." The court did not address Ron's argument in opposition to the motion that the adverse possession cause of action was barred by res judicata and the primary rights doctrine.

5

On October 4, 2010, the trial date, counsel for the parties appeared and conferred with the trial court in chambers. The minute order states: "Counsel stipulate to a new trial. Stipulation shall be placed in writing."[4] Lyle also filed a motion to amend the cross-complaint, in part based on the trial court's invitation after the first trial to clarify the dates on which Lyle based his claim of adverse possession. The court granted Lyle's request for leave to file a first amended cross-complaint, which Lyle promptly filed.

Lyle's first amended cross-complaint alleged causes of action for quiet title and an accounting by Ron of rents received and expenses incurred on the property from October 2008 through the date of trial. Lyle alleged that he had satisfied all of the requirements for adverse possession of the property for a period of more than five years, specifically, from December 26, 1986 through May 1, 2008. He alleged that he perfected title by adverse possession as of February 18, 1992 or, alternatively, on each day thereafter until December 31, 2007. Lyle alleged that during this time period he "was the record owner with the County Recorder [and] was listed on the property tax rolls as the record owner responsible for paying the property taxes . . . ." Lyle further alleged that he occupied the property "under a claim of right, and, alternatively, under color of title based on his belief that he remained the true owner under the Grant Deed recorded on or about December 26, 1986."

On June 20, 2011 the parties filed a document entitled "Joint Stipulation of Facts for Submittal of Case for Decision." Among the 23 stipulated facts were the following:

"7.     The property in question[] was purchased by Lyle from Lyle and Ron's Father, on or about December 26, 1986, and was recorded on December 31, 1986 in the office of the Recorder of Los Angeles County."

"3.     On February 17, 1987 Lyle executed a deed . . . transferring [the] property . . . to Ron."

---

**4**     The record does not include a reporter's transcript of these proceedings.

"8.     At or some time near the time of the execution of the deed, Lyle asked Ron not to record it."

"11.     Ron was unable to find the deed after the separation [of the brothers in 1987], and erroneously assumed that Lyle had taken the deed.

"12.     In 1987 or early 1988, Ron told Lyle that he, Ron[,] could not find the deed, and Lyle replied that without the deed, Ron had nothing."

"10.     On or about July 1988, Lyle sued Ron to stop the foreclosure on certain notes due from Lyle to the Estate of George Keller (deceased), secured by real property, including the subject property, in connection with Ron's role as administrator of George Keller's estate."[5]

"13.     The deed was discovered by Ron, in his home, in 2006 and promptly recorded on March 24, 2006.

"14.     Lyle exercised exclusive possession, hostile, open, and notorious, in control over the property, including renting the property, collecting rents and paying all the property taxes [except to license fees imposed on rental operations in Baldwin Park, if determined by the court to be taxes, were not completely paid], continuously from the date he purchased the property from his Father, prior to execution of the deed to Ron on February 17, 1987, until the date the deed was recorded by Ron on March 24, 2006.

"15.     After recordation of the deed in 2006, Lyle and Ron fought over the issue, and Lyle filed a litigation seeking relief, and thereafter the two were in conflict and exclusivity of control ceased.

"16.     From the date Lyle acquired title from his Father, until the date Ron recorded the deed, title to the property ['record title'], on the books of the County Recorder of Los Angeles County, remained in the name of Lyle."

---

[5]     The parties stipulated to this fact even though George did not die until 1991.

"20.   Ron attempted to take possession of the property on or about March 24, 2006, and thereafter a dispute arose between Ron and Lyle over collection of rents and the control, and management, of the property.

"21.   Lyle did not pay any property taxes after the December 10, 2007 property tax payment on the property.

"22.   At all times prior to the recordation of the deed on March 24, 2006, Lyle held title to the property insofar as he was concerned, and exercised exclusive control, including payment of the property taxes and exercise of exclusive control.  However, Lyle did not pay all the license fees imposed by the City of Baldwin Park on the owners of rental property in connection with their renting of said property."

The stipulation included a provision that Ron would receive $15,000 in damages if the court ruled in his favor, and a provision that reserved jurisdiction for the court to determine what damages Lyle would receive if the court ruled in his favor.

After giving the parties an opportunity to brief the legal issues based on the stipulated facts, the trial court issued a tentative decision on July 21, 2011.  This time Lyle won.  The court set a hearing for August 12, 2011.  Ron filed objections, including that Lyle's cross-complaint was barred by res judicata and the primary rights doctrine.

After the hearing, the trial court on August 18, 2012 issued its statement of decision.  The court ruled that Lyle was the owner of the property by adverse possession and quieted title in favor of Lyle as of October 23, 2008.  The court ruled that the first action was "one involving the primary right of having a clear title to the property when it is alleged that the title was obtained by fraud," whereas this action involved "the right of possession, ownership, and title by a new prescriptive title," and "therefore res judicata or the splitting of cause of action does not apply."  Citing *McNulty v. Copp* (1954) 125 Cal.App.2d 697 and *Branson v. Sun-Diamond Growers* (1994) 24 Cal.App.4th 327, the trial court ruled:  "Clearing title by fraud and seeking title by adverse possession do not involve the same primary rights and thus this lawsuit is not precluded by the theory against splitting causes of action."

8

On the merits of Lyle's adverse possession claim, the trial court ruled: "By reason of stipulated facts numbered 12, 13, and 22 all five [of the elements required to obtain title by adverse possession] have been met by Lyle. Thus from early 1988 . . . on Ron was put on notice that by not having the deed he essentially had no rights to the property at issue and that Lyle was asserting ownership over it. Also, by reason of stipulated fact 10 Ron recognized Lyle as the owner of the property. Lyle continued thereafter to exercise all dominion and control over the property until March 24, 2006. The Court therefore concludes that by some time in early 1993 and each day thereafter Lyle owned the property by adverse possession, having obtained a prescriptive title. The Court finds this to be true even though Lyle continued to be the record title holder until March 24, 2006. It should be noted that Ron was the title holder but not the record title holder during said period." The trial court ruled that Lyle "is the legal and equitable owner of the Property as of October 28, 2008, as result of [Lyle's] adverse possession," and ordered Ron to provide Lyle with a financial accounting of all rents collected and expenses incurred during Ron's possession and use of the property from May 2008 to August 2011. On September 16, 2011 the trial court granted Lyle immediate possession of the Property.

The parties stipulated to refer Lyle's claim for an accounting of the income and expenses during the time Ron had possession of the property to retired Judge Gabriel Gutierrez. On March 26, 2012 Judge Gutierrez submitted his report to the trial court. After a hearing, the trial court adopted the report and ordered Ron to pay Lyle $55,576.

On May 3, 2012 the trial court entered judgment in favor of Lyle. Ron filed a timely appeal.

## DISCUSSION

Ron contends that the judgment in the prior action, case No. BC356629, on Lyle's complaint for cancellation, quiet title, and injunctive relief, is res judicata and bars Lyle's claim in this action for quiet title based on adverse possession for the property. Ron

9

asserts that Lyle's cause of action to quiet title based on cancellation of the quitclaim deed in the prior action involved the same primary right as Lyle's cause of action to quiet title based on adverse possession. Lyle argues that the doctrine of res judicata does not apply because his two actions did not involve the same primary right. We agree with Ron that the two actions involved the same primary right: title to and ownership of the property. Therefore, the doctrine of res judicata bars Lyle's cross-complaint, and the trial court erred by ruling that Lyle obtained title to the property by adverse possession. (See *Crowley v. Katleman* (1994) 8 Cal.4th 666, 681; *Amin v. Khazindar* (2003) 112 Cal.App.4th 582, 589.)[6]

"Under the doctrine of res judicata, a valid, final judgment on the merits is a bar to a subsequent action by parties or their privies on the same cause of action. [Citation.]" (*Amin v. Khazindar*, *supra*, 112 Cal.App.4th at p. 589.) "[R]es judicata bars relitigation of the same cause of action by the same parties and . . . the definition of a cause of action for this purpose depends, not on the legal theory or label used, but on the primary right sought to be protected in the two actions." (*Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1517, fn. 17.) Whether causes of action in two lawsuits are the same for purposes of res judicata depends on whether they involve the same "primary right." (*Crowley v. Katleman*, *supra*, 8 Cal.4th at p. 681; see *Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797 ["[t]o determine whether two proceedings involve identical causes of action for purposes of claim preclusion, California courts have 'consistently applied the "primary rights" theory'"]; *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 904 ["California's res judicata doctrine is based upon the primary right theory"]; *Le Parc Community Assn. v. Workers' Comp. Appeals Bd.* (2003) 110

---

[6] "The application of the doctrine of res judicata is a question of law we review de novo." (*State Farm General Ins. Co. v. Workers' Comp. Appeals Bd.* (2013) 218 Cal.App.4th 258, 268, fn. 4; see *Happy Nails & Spa of Fashion Valley, L.P. v. Su* (2013) 217 Cal.App.4th 1459, 1469 [whether collateral estoppel applies is a question of law reviewed de novo].)

10

Cal.App.4th 1161, 1170 ["California law defines a 'cause of action' for purposes of the res judicata doctrine by analyzing the primary right at stake"].)

"[T]he primary right theory provides that a cause of action consists of (1) a primary right possessed by the plaintiff, (2) a corresponding duty devolving upon the defendant, and (3) a delict or wrong done by the defendant which consists of a breach of the primary right. [Citation.]" (*Amin v. Khazindar*, *supra*, 112 Cal.App.4th at p. 589.) "The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action. [Citation.] A pleading that states the violation of one primary right in two causes of action contravenes the rule against 'splitting' a cause of action. [Citation.]" (*Crowley v. Katleman*, *supra*, 8 Cal.4th at p. 681.) There may be many legal theories that allege liability based on a violation of a single primary right and many remedies for the violation. (*Id.* at pp. 681-682.) "[T]he primary right is simply the plaintiff's right to be free from the particular injury suffered." (*Id.* at p. 681; see *Olsen v. Breeze, Inc.* (1996) 48 Cal.App.4th 608, 625 ["[e]xamples of primary rights include the right to be free from personal injury [citation], the right to possession of real property [citation], the right to possession of personal property [citation], and the right to performance of a contractual obligation"].) A "'cause of action' is based upon the harm suffered, as opposed to the particular theory asserted by the litigant." (*Slater v. Blackwood* (1975) 15 Cal.3d 791, 795; see *Boeken v. Philip Morris USA, Inc.*, *supra*, 48 Cal.4th at p. 798 ["under the primary rights theory, the determinative factor is the harm suffered"].)

Here, the judgment in the prior action adjudicated Lyle's ownership rights and interest in the property. In his complaint in the prior action and his cross-complaint in this action, Lyle "asserted a single primary right": his right to own and possess the property, free of Ron's claims. (*Wade v. Ports America Management Corp.* (2013) 218 Cal.App.4th 648, 657.) The harm Lyle claims he suffered in both actions is the same: loss of his rights in the property. In the prior action, Lyle sought a judgment that he was "the owner in fee simple of the property" and that Ron had "no interest in the property adverse to [Lyle]." Similarly, in this action, Lyle sought a judgment that he was "the

11

legal and equitable owner of the property . . . ."  It is true, as the trial court stated, that Lyle's claim in the first action sought to obtain "clear title to the property" by alleging (falsely, as it turned out) that Ron had obtained title to the property by fraud, and that Lyle's claim in this action sought to obtain "prescriptive title."  But both actions involved the same primary right: title to the property.  (See *Blackmore v. Powell* (2007) 150 Cal.App.4th 1593, 1601 ["successful claimant by adverse possession . . . gains title to [the] property"].)  In both actions, Lyle's "true interest," ownership and possession of the property, "remain[ed] unchanged, as [did] the existence of the impediment [to Lyle's] desires," Ron's claim of ownership and possession of the property.  (*Weikel v. TCW Realty Fund II Holding Co.* (1997) 55 Cal.App.4th 1234, 1249.)[7]

The only difference between Lyle's prior action and this action was his theory of recovery.  In the prior action Lyle sought to recover title by canceling the February 17, 1987 deed on the ground Ron obtained it by fraud, and in this action Lyle sought to recover title by claiming adverse possession against Ron.  Differences in theories of recovery on the same primary right, however, do not avoid the bar of res judicata.  (See *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 642 ["cases have invoked the rule against splitting causes of action in order to abate a later suit or bar it on res judicata grounds when that suit alleged a different theory of recovery for the same injury"]; *Crowley v. Katleman*, *supra*, 8 Cal.4th at p. 682 ["numerous cases hold that when there is only one primary right an adverse judgment in the first suit is a bar even though the second suit is based on a different theory [citation] or seeks a different remedy"]; *Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 595 [""if two actions involve the same injury to the plaintiff and the same wrong by the defendant then the same primary right is at stake even if in the second suit the plaintiff pleads different

---

[7]     Although "the question of whether a cause of action is identical for purposes of res judicata depends not on the legal theory or label used, but on the 'primary right' sought to be protected in the two actions" (*Johnson v. American Airlines, Inc.* (1984) 157 Cal.App.3d 427, 432), Lyle even gave his causes of action in both cases the same label of "quiet title."

theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery"'"].)  And Lyle's theories in the two actions were not even all that different.  In the prior action, Lyle sought to quiet title against Ron's claim to the property, despite the fact that Ron "claim[ed] some right, title, estate, lien or interest in and to the lands of [Lyle] . . . based on the" February 17, 1987 quitclaim deed.  In this action, Lyle alleged that he was "seek[ing] to quiet title" by adverse possession against Ron's claim to the property "based on a quitclaim deed from [Lyle] signed on or about February 17, 1987, and recorded on or about March 24, 2006," and a determination that Ron had "no right, title, estate, lien, or interest in the Property, or any part of it."

*McKenna v. Elliott & Horne Co.* (1953) 118 Cal.App.2d 551 applied res judicata to bar a subsequent claim based on adverse possession after prior litigation between the same parties to cancel a deed and to quiet title regarding the same property.  In the first action, McKenna claimed ownership under a deed and obtained a default judgment against Sipe for quiet title.  (*Id.* at p. 553.)  In the second action, filed two years later, Sipe sought to quiet title in his favor based on a recorded deed of trust and a showing that McKenna had fraudulently obtained the deed under which she claimed title in the first action.  The trial court entered judgment for Sipe and vacated the previous judgment quieting title in McKenna.  (*Ibid.*)  The Court of Appeal affirmed the judgment (and imposed monetary damages on McKenna for prosecuting a frivolous appeal).  (See *Sipe v. McKenna* (1951) 105 Cal.App.2d 373, 375; *Sipe v. McKenna* (1948) 88 Cal.App.2d 1001, 1006.)

Three years later McKenna filed a third action seeking to quiet title based on adverse possession.  The court ruled that res judicata barred the third action.  (See *McKenna v. Elliott & Horne Co.*, *supra*, 118 Cal.App.2d at pp. 552-553, 554-555.)  The court stated that McKenna "could not have acquired a title by adverse possession subsequent to the entry of the judgments in the actions in which her claims were rejected. . . .  [McKenna's] claims were adjudicated in these two actions, and her present suit, to be successful, must be based upon a title acquired subsequent to such adjudications.  She failed in her first amended complaint to show such a title.  Her present

13

arguments, like her arguments in the court below, constitute no more than an attempt to relitigate matters which have been settled by judgment." (*Id.* at p. 554.)

McKenna claimed title based on a deed. She lost. Lyle claimed title based on a deed and a challenge to another deed. He lost.[8] McKenna subsequently tried to claim title based on adverse possession. Res judicata judicata barred her claim. Lyle also subsequently tried to claim title based on adverse possession. Res judicata bars his claim too.

*McNulty v. Copp*, *supra*, 125 Cal.App.2d 697 applied res judicata in a similar situation. *McNulty* involved two sisters, Anita and Olive, fighting over real property owned by their father. Hours after their father died, Anita recorded a deed giving the property to her, but the deed had the wrong lot numbers on it. Anita filed an action to reform the deed to recite the correct lot numbers, and Olive filed a cross-complaint for cancellation of the deed and for quiet title, alleging that Anita had fraudulently obtained the deed from their nearly blind and dependent father. (*Id.* at p. 700.) Olive won the first lawsuit. Olive then filed a second lawsuit to recover damages caused by Anita's wrongful possession of the property. The court held that the two actions involved the same primary right, Anita's "wrongful possession of the real property," and res judicata applied to bar the second action. (*Id.* at pp. 703, 704.) The court stated: "The same wrongful act—the possession under a false claim of right—gave rise to both the original action and the [second] action. To allow the subsequent . . . action to be prosecuted is to allow [Olive] to split the same cause of action." (*Id.* at p. 705.) Thus, *McNulty*, cited by the trial court in its statement of decision in favor of Lyle, actually supports Ron's contention that the two civil actions brought by Lyle against Ron involved the same primary right.

---

[8]    The only difference is that McKenna obtained the deed that gave her title by fraud, whereas Lyle tried unsuccessfully to prove that the deed that gave title to someone else was obtained by fraud.

*Branson v. Sun-Diamond Growers*, *supra*, 24 Cal.App.4th 327, which the trial court found "fully support[ed]" its decision, is readily distinguishable. In *Branson*, a corporate agent unsuccessfully sued for indemnification under Corporations Code section 317, and then sued for breach of a contract for indemnity. (*Branson*, *supra*, at p. 343.) The court concluded that the agent's two claims involved different primary rights, one a statutory right giving "agents of corporations the right to seek authorization for indemnity against adverse judgments . . . against them for their reasonable and good faith acts on behalf of the corporation," and the other a "[c]ontractual . . . right to indemnity pursuant to the terms of the contract." (*Ibid.*) The court also noted that Corporations Code section 317, subdivision (g), did not apply to contractual indemnification rights because the statute states "it has no preclusive effect on any other legal right [the agent] may have for indemnity," and that the agent could not have recovered on his contractual claims in the context of the limited section 317 proceeding. (*Branson*, *supra*, at p. 345; see *Le Parc Community Assn. v. Workers' Comp. Appeals Bd.*, *supra*, 110 Cal.App.4th at p. 1170 ["exception to general res judicata (and collateral estoppel) principles applies when the Legislature has specified exactly what preclusive effect a judicial determination has"].) In contrast, Lyle's two attempts to obtain title to the property did not involve different primary rights with separate statutory and non-statutory bases, there is no legislative expression of a limitation on the application of res judicata to the kind of claims brought by Lyle, and nothing prevented Lyle from bringing his adverse possession claim in the first action. Indeed, Lyle belatedly recognized as much when he sought, after entry of judgment in the prior action, to reopen the case and add a cause of action for adverse possession.

Cases from other jurisdictions, like *McKenna* and *McNulty*, have held that a judgment in a quiet title action alleging title by deed or similar document is res judicata in a subsequent action to obtain title by adverse possession, where, as here, the claimant and the property are the same. For example, in *Blance v. Alley* (Me. 1997) 697 A.2d 828, the claimant unsuccessfully tried twice to quiet title by deed, but was unable to prove her title. (*Id.* at p. 829.) Several years later she filed a third action seeking to establish title

15

in the same parcel, this time by adverse possession. The court rejected her argument that her adverse possession claim was different from her claims in the two prior actions and held that her third action was barred by res judicata. (*Id.* at p. 830.) In *Bagley v. Moxley* (1990) 407 Mass. 633 [555 N.E.2d 229], the plaintiffs failed to quiet title based on a certificate of title. In a second action, the plaintiffs claimed title by adverse possession. (*Id.*, 555 N.E.2d at pp. 230-231.) The court stated: "The gravamen of the plaintiffs' complaint in both [lawsuits] was the same; the plaintiffs claimed ownership of the disputed land. . . . [T]his was the primary issue in dispute . . . . The plaintiffs were not entitled to pursue their claim of ownership through piecemeal litigation . . . ." (*Id.* at p. 232.) The court held that the plaintiffs could have and should have asserted the adverse possession claim in the first action, and therefore were barred from litigating their claim in the second action. (*Ibid.*; see also *Lewis v. Matteo* (Conn.App. 1996) 679 A.2d 366, 367 [plaintiff's first unsuccessful action to quiet title by claiming title by deed barred second action claiming title by adverse possession on res judicata grounds]; *Hangman v. Bruening* (1995) 247 Neb. 769, 772 [530 N.W.2d 247, 249] ["present quiet title action, although based upon the theory of adverse possession, involved the same rights between the same parties as did the [prior] quiet title action," and because the "theory of adverse possession could have been raised in the earlier quiet title litigation," all "matters which could have been litigated in the earlier proceedings are barred by the doctrine of res judicata"]; *American Estate Mgmt. Corp. v. International Inv. & Dev. Corp.* (Utah App. 1999) 986 P.2d 765, 776-778 [plaintiff's first unsuccessful action to establish ownership of parking lot by contract barred second action for adverse possession of the same parking lot because "both its prior and present actions assert one claim—a claim of title to the parking lot parcel—albeit under two different legal theories"].)

The fact that, when Lyle finally sought leave to amend his complaint in the prior action to add a specific cause of action for quiet title by adverse possession it was too late, does not preclude res judicata from barring Lyle's cross-complaint in this action. """"If the matter was within the scope of the [prior] action, related to the subject matter

16

and relevant to the issues, so that it could have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged. . . .  The reason for this is manifest.  A party cannot by negligence or design withhold issues and litigate them in consecutive actions.  Hence the rule is that the prior judgment is res judicata on matters which were raised or could have been raised, on matters litigated or litigable.  [Citations.]"  [Citation.]'  [Citation.]"  (*Amin v. Khazindar*, *supra*, 112 Cal.App.4th at pp. 589-590, italics omitted; see *Sutphin v. Speik* (1940) 15 Cal.2d 195, 202 [same]; *Burdette v. Carrier Corp.* (2008) 158 Cal.App.4th 1668, 1674-1675 ["[r]es judicata bars the relitigation not only of claims that were conclusively determined in the first action, but also matter that was within the scope of the action, related to the subject matter, and relevant to the issues so that it could have been raised"].)  For purposes of res judicata, "it is of no moment whether the identical causes of action were *in fact* litigated in [the prior action]; all that is required is that [the plaintiff] have had the *opportunity* to litigate them in" the prior action.  (*Weikel v. TCW Realty Fund II Holding Co.*, *supra*, 55 Cal.App.4th at p. 1245; see *McNulty v. Copp*, *supra*, 125 Cal.App.2d at p. 704 [in a quiet title action, the court can "and should dispose of all claims relating to" the property].)  Lyle had the opportunity to litigate his adverse possession claim in the prior action, and that is enough for purposes of res judicata.

Moreover, not only could Lyle have raised the issue of adverse possession in the prior action, Lyle actually did raise the issue, before the trial court in that action issued its statement of decision and entered judgment.  Lyle argued in one of his trial briefs in the prior action that he was "the owner by Adverse Possession of the Merced Property due to continuous possession for [the] last 19 years."  Lyle contended that he had obtained ownership "under [the] Adverse Possession statutes" because during those 19 years he "never left ownership and control, possession and management of the Merced property even after execution of the [quitclaim deed]. . . .  He paid all secured debts upon [the] property, [h]e paid taxes, made repairs, leased the property, managed tenants [*sic*] affairs, [and] vigorously defended his property rights when Ronald attempted to foreclose . . . ."  Lyle asked the court in the prior action "to find in his favor . . . and issue [an] order for

17

cancellation of [the quitclaim deed Ron] recorded on March 25, 2006 either by reason of Adverse Possession . . . or [because the quitclaim deed] was never intended to be delivered" to Ron. Although the trial court in the prior action did not reach the issue of adverse possession in its statement of decision, Lyle's advocacy on the issue confirms that his claim of title based on adverse possession involved the same primary right as his claim of title based on the deed from his father (and the invalidity of Ron's deed), and that litigation of the issue belonged in the prior action.

Finally, Lyle argues that because Code of Civil Procedure section 761.020, subdivision (d), requires that a quiet title plaintiff state the date as of which the plaintiff seeks to quiet title, each time the plaintiff files a quiet title action with a different date the plaintiff is litigating a different primary right.[9] Under this theory, when Lyle filed a cross-complaint in this action to quiet title as of October 23, 2008, Lyle was seeking to enforce a different primary right from the one he sought to enforce in the prior action when he sought to quiet title as of February 17, 1987. Lyle contends that if Ron had wanted to litigate in the prior action the primary right of who had title to the property on a different date, Ron would have had to have filed a cross-complaint pursuant to Code of

---

[9]     Code of Civil Procedure section 761.020 provides:
          "The complaint shall be verified and shall include all of the following:
          "(a)  A description of the property that is the subject of the action.  In the case of tangible personal property, the description shall include its usual location.  In the case of real property, the description shall include both its legal description and its street address or common designation, if any.
          "(b)  The title of the plaintiff as to which a determination under this chapter is sought and the basis of the title.  If the title is based upon adverse possession, the complaint shall allege the specific facts constituting the adverse possession.
          "(c)  The adverse claims to the title of the plaintiff against which a determination is sought.
          "(d)  The date as of which the determination is sought.  If the determination is sought as of a date other than the date the complaint is filed, the complaint shall include a statement of the reasons why a determination as of that date is sought.
          "(e)  A prayer for the determination of the title of the plaintiff against the adverse claims."

18

Civil Procedure section 761.040.**10** Lyle asserts that Ron's primary rights argument "request[s] that this court nullify the Legislature's clear intention to permit two suits to quiet title, based on two different dates," and that the court in the prior action "had no jurisdiction to award Ronald title to the property on any [other] date after February 17, 1987."

Code of Civil Procedure section 761.020 lists the requirements, in addition to verification, of a complaint for quiet title: (a) a description of the property, (b) title of the plaintiff and the basis for that title, (c) the adverse claims to the plaintiff's title, (d) the date as of which the determination is sought, and (e) a prayer for the determination of plaintiff's title against the adverse claims. Failure to allege any of these elements may subject a quiet title complaint to demurrer. But nothing in the statute suggests that alleging different dates pursuant to subdivision (d) for the same property creates different primary rights. Nor has Lyle cited any authority for his assertion that the statutory requirement of stating the "date as of which the determination is sought" has any effect on the primary rights analysis for res judicata purposes, or that by filing successive quiet title actions for the same property with different "as of" dates a plaintiff is seeking to vindicate different primary rights. As noted above, Lyle sought the same relief against Ron in this action that he sought in the prior action: ownership of the property.

Moreover, the sole authority cited by Lyle, California Real Property Remedies and Damages (Cont.Ed.Bar. 2d ed. 2002) section 7.34, "Effective Date of Plaintiff's Title," does not support Lyle's position. The passage from this treatise quoted by Lyle states: "The legislative intent behind this section (not apparent from its language) is to enable the plaintiff to obtain a judgment establishing the plaintiff's title that is effective on a date earlier than the filing date of the complaint but that does not permit the plaintiff to quiet

---

**10** Code of Civil Procedure section 761.040 provides:
"(a) The defendant may by cross-complaint seek affirmative relief in the action.
"(b) If the defendant seeks a determination of title as of a date other than the date specified in the complaint, the cross-complaint shall include the date and a statement of the reasons why a determination as of that date is sought."

19

title to after-acquired property (*i.e.,* the date alleged in the complaint limits the court's jurisdiction in that any interest plaintiff acquires after that date, whether under color of title, adverse possession, or other means, cannot be litigated and should not be pleaded in the underlying action). See 15 Cal L Rev'n Comm'n Reports 1198 (1980)." Such an intent, however, is not only "not apparent" from the language of the statute, it is not apparent from the legislative history. The Law Revision Commission Report for Code of Civil Procedure section 761.020, subdivision (d), which the CEB treatise cites, states only that "[s]ubdivision (d) is intended to permit a title determination as of a date prior to the date of the action." (15 Cal. L. Revision Comm'n Reports (1980) p. 1198.)[11] It does not state that the "intent behind" subdivision (d) was to "limit the court's jurisdiction" to determine what can be pleaded and litigated in a quiet title action. The Law Revision Commission Report states that subdivision (d) "implements suggestions in L. Simes & C. Taylor, The Improvement of Conveyancing by Legislation xxii (1960), and Willemsen, *Improving California's Quiet Title Laws*, 21 Hastings L.J. 835, 853 (1970)." (*Ibid*.) And neither of these secondary sources says anything about limiting what parties can litigate in a quiet title action, nor about the effect of a quite title judgment in the future.

To the contrary, these authorities suggest that the Legislature's purpose in enacting Code of Civil Procedure section 761.020, subdivision (d), was to solve a problem about the past: How far back must a quiet title plaintiff trace through recording documents to find potential claimants. The Simes and Taylor treatise proposes: "It should . . . be possible not only to quiet title as of the present time but to secure a decree establishing the title to a tract of land as of any selected prior date. Thus, if a large number of city lots were held by a single owner fifteen years prior to the filing of suit, it should be possible

---

[11] See *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 148 ["the official comments of the California Law Revision Commission 'are declarative of the intent not only of the draftsman of the code but also of the legislators who subsequently enacted it'"]; *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 542 ["'[e]xplanatory comments by a law revision commission are persuasive evidence of the intent of the Legislature in subsequently enacting its recommendations into law'"].

20

to have a single decree declaring the state of the title in the entire tract as of fifteen years back.  From then on, no investigation would be necessary as to the records prior to this decree." (Simes & Taylor, The Improvement of Conveyancing by Legislation, *supra*, at p. xxii.)  In his law review article, Willemsen states:  "How far back must a plaintiff trace a perfect record title in order to prove a cause of action under our proposed legislation?[12]  I suggest the plaintiff be allowed to specify the operative date in his complaint.  If he can show perfect record title from 1910, he so pleads and proves and should receive a decree quieting title against any claims of record arising after 1910." (Willemsen, *Improving California's Quiet Title Laws*, *supra*, 21 Hastings L.J. at p. 853.)

---

**12** Willemsen's proposed legislation, which included four suggested changes to California's quiet title laws, was "[t]o permit an in rem quiet title action based upon record title from a date antecedent to all claims at issue." (Willemsen, *Improving California's Quiet Title Laws*, *supra*, 21 Hastings L.J. at p. 838.)  The proposal was designed to address "the immense difficulties of proving good title, which for example, might require proving the terms of an unrecorded and subsequently lost deed, or that an 1880 survey was in error, or that an 1892 deed incorrectly expressed the parties' intentions." (*Id*. at p. 837.)

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court with directions to enter judgment in favor of Ron on Lyle's first amended cross-complaint, to enter judgment in favor of Ron on Ron's complaint for an accounting and for monetary damages in the amount of $15,000, and to issue an order granting Ron immediate possession of the property.  Ron is to recover his costs on appeal.

SEGAL, J.*

We concur:

PERLUSS, P. J.

WOODS, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.