Filed 10/25/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| DWIGHT SUMMERFIELD et al., | B324117 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 21STCV30545) |
| v. | |
| CITY OF INGLEWOOD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa A. Beaudet, Judge. Affirmed.

Law Office of Christie E. Webb, Christie E. Webb; Law Office of Judith K. Williams and Judith K. Williams for Plaintiffs and Appellants.

Olivarez Madruga Law Organization, Thomas M. Madruga and Tania Ochoa for Defendant and Respondent.

# INTRODUCTION

Dwight and Patricia Summerfield and the estate of Andrew Summerfield (appellants) filed a wrongful death action for the death of the Summerfields' son Andrew against the City of Inglewood (the City). Appellants alleged the City was negligent and created a "dangerous condition" in a public park by failing to install security cameras in an area with ongoing criminal activity, which caused an unknown third party to fatally shoot their son.

The trial court sustained the City's demurrer to the complaint with leave to amend. Appellants filed a first amended complaint, which the trial court sustained, this time without leave to amend. The trial court then entered a judgment of dismissal.

We conclude appellants' dangerous condition and negligence claims fail and the trial court did not err in declining to grant leave to amend. We therefore affirm the judgment of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Complaint*

On August 18, 2021, appellants filed a complaint against the City, alleging two causes of action for 1) dangerous condition on public property and 2) negligence.

The complaint alleged the following:

On January 5, 2021, Andrew (decedent) drove to Darby Park in the City of Inglewood to play basketball. Decedent was shot and killed while he was in his vehicle in the Darby Park parking lot.

Darby Park and its facilities are "owned, maintained, supervised, [and/or] controlled" by the City. Darby Park "was supposed to be closed to the public due to Covid-19." Appellants are informed and believe "a Parks and Recreation employee [of the City] opened the Darby Park gym to the public in violation of the [C]ity's Covid-19 protocol, which was a substantial factor in drawing people to Darby Park" including decedent and the perpetrator. Appellants "are informed and believe . . . there have been multiple shooting[s] at Darby Park prior to January 5, 2021."

On the day of the shooting on January 5, 2021, "there were no cameras in the Darby Park parking lot, and a lack of adequate precautions . . . including but not limited to, attendants, control measures, and/or security." Darby Park and its adjacent parking lot constitute a "dangerous condition" that the City failed to remedy or prevent, "despite actual or constructive knowledge of the condition." The City was "negligent in connection with their ownership, control, maintenance, and/or use of the premises." The City breached its duty of care to decedent and appellants by failing to provide security cameras in the area, failing to provide adequate precautions, and failing to provide adequate warning about the dangerous condition.

As a direct and proximate cause of the City's negligence and unsafe condition of the premises, the decedent was shot and appellants suffered significant injuries, including special/economic damages (such as decedent's hospital and medical expenses), general/non-economic damages, as well as the related loss of love, companionship, comfort, care, affection, and guidance of decedent.

**B.** *Demurrer to the Complaint and Trial Court's Ruling*

On November 16, 2021, the City filed a demurrer to the complaint pursuant to Code of Civil Procedure section 430.10, subdivisions (e) and (f).

At the hearing on May 2, 2022, the trial court sustained the demurrer with leave to amend. The court ruled:

Whether the City failed to provide "adequate precautions," such as "control measures and/or security," could not form a basis for liability because the City "is immune from liability arising from its failure to provide security or supervision at Darby Park" parking lot. Public entities generally are not liable for failing to protect against third party crime. As for the City's alleged failure to provide other "precautions" constituting a dangerous condition, the court found the allegation vague. With respect to appellants' second allegation that the City failed to provide "adequate warning" about the dangerous condition, the court found the City's alleged failure to warn of criminal activity in the Darby Park parking lot could not form a basis for liability. With respect to appellants' third allegation, the court found the absence of security cameras *might* provide a basis for liability against the City under Government Code section 835. However, the court found the complaint failed to allege "why the lack of cameras in this instance created a substantial risk of [d]ecedent's shooting such that it constituted a dangerous condition" per Government Code section 830, subdivision (a).

**C.** *The Allegations of the First Amended Complaint*

On May 17, 2022, appellants filed a first amended complaint (FAC). For the most part, the FAC listed the same two causes of action and alleged the same facts set out in the original

4

complaint. The FAC added these facts and clarifications:

A "City of Inglewood Parks and Recreation employee opened the Darby Park gym to the public in violation of the [C]ity's Covid-19 protocol, which was a substantial factor in drawing people to Darby Park" including decedent and the perpetrator. Appellants are informed and believe "there were no policies, procedures and/or guidelines in place in order for the City of Inglewood Parks and Recreation employees to comply with COVID-19 protocol." The City "failed to ensure controlling and/or security measures for the Darby Park gym to be closed to the public, including . . . measures that would have precluded Parks and Recreation employees from opening the Darby Park gym to the public, such as limiting employees' access to means or facilities necessary to open the D[a]rby Park gym and/or specific instructions to refrain from opening the Darby Park gym." Appellants cited Government Code sections 815.2, subdivision (a) and 815.4 in support of the FAC.

There have been "multiple shootings" at Darby Park before January 5, 2021. "A 7-year-old boy was shot and killed on December 8, 1997 in Darby Park . . . which [appellants] are informed and believe was a result of gang retaliation. [¶] . . . A 22-year-old man was fatally shot in his car in the parking lot of D[a]rby Park . . . on October 15, 2012." Appellants believe that "considering multiple shootings at Darby Park prior to January 5, 2021, lack of cameras present attractive opportunities to the criminal element of society, which renders the Darby Park parking lot attractive to criminal activities and inherently dangerous."

At the time of the shooting, there were no cameras in the Darby Park parking lot and a lack of adequate precautions such

5

as "control measures and/or security."  This constituted a "dangerous condition" that the City "failed to remedy or prevent, despite actual or constructive knowledge of the condition."  The City was also "negligent in connection with [its] ownership, control, maintenance, and/or use of the premises."  As a "direct, proximate, and legal result" of the dangerous condition and the City's negligence, decedent was shot, causing appellants to suffer significant injuries.

The City is liable for violating Government Code section 835 and is liable for decedent's death caused by a breach of its mandatory duty per Government Code section 815.6.  The City breached its duty of care by maintaining a dangerous condition, including "[f]ailing to provide any adequate precautions" such as control measures and security, "[f]ailing to provide cameras in the Darby Park parking lot", and "[f]ailing to provide any adequate warning about the dangerous condition."

## D.    *Demurrer to the FAC and the Trial Court's Ruling*

On June 20, 2022, the City filed a demurrer to the FAC pursuant to Code of Civil Procedure section 430.10, subdivisions (e) and (f).  The City presented several arguments as to why the complaint failed to state causes of action for dangerous condition of public property and for negligence.

On August 2, 2022, the trial court heard oral argument and sustained the demurrer as to both causes of action without leave to amend.

The court ruled the FAC did "not sufficiently allege[] facts to cure the prior defect" and did not "set forth allegations that show that the lack of surveillance cameras created a substantial risk of [d]ecedent's shooting."  The court found the "new allegations do not demonstrate that the absence of surveillance

6

cameras within Darby Park created a substantial risk of injury to [d]ecedent, thereby rendering Darby Park a dangerous condition." The court further found that because appellants' negligence cause of action is predicated upon their dangerous condition of public property cause of action, the negligence cause of action "must similarly fail."

On August 16, 2022, the trial court entered judgment in favor of the City and against appellants.

This appeal followed.

## DISCUSSION

Appellants argue the trial court erred in sustaining the City's demurrer to the FAC without leave to amend as to both the negligence and dangerous condition on public property causes of action. We disagree.

### A. *Standard of Review*

"In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we assume the truth of all properly pleaded facts. We examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory regardless of the label attached to a cause of action. [Citation.] We do not assume the truth of contentions, deductions, or conclusions of fact or law, and may disregard allegations that are contrary to the law or to a fact that may be judicially noticed." (*Fischer v. Time Warner Cable Inc.* (2015) 234 Cal.App.4th 784, 790.) We review de novo a trial court's ruling on a demurrer and examine the operative complaint to determine whether it alleges facts sufficient to state a cause of action under any legal theory. (*King v. CompPartners, Inc.* (2018) 5 Cal.5th 1039, 1050 (*King*); *Dudek v. Dudek* (2019)

7

34 Cal.App.5th 154, 163 (*Dudek*).)  We will affirm an order sustaining a demurrer on any proper legal ground whether or not the trial court relied on that theory or it was raised by the defendant.  (*Fischer*, at p. 790.)

In addition, " '[w]hen a demurrer is sustained *without leave to amend*, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." ' " (*Dudek, supra,* 34 Cal.App.5th at p. 163, italics added.)  Here, appellants shoulder the burden to show a reasonable possibility the operative complaint can be amended to state a cause of action.  (*Id.* at pp. 163–164; *King, supra,* 5 Cal.5th at p. 1050.)  They can make this showing in the first instance to the appellate court.  (*Roman v. County of Los Angeles* (2000) 85 Cal.App.4th 316, 322 (*Roman*).)

B.  ***The Trial Court Properly Sustained the Demurrer to Cause of Action for Dangerous Condition on Public Property.***

Appellants contend the FAC alleged sufficient facts, "including two shootings that resulted in deaths" such that they "should be allowed to go forward and present evidence that the [City's] failure to install cameras or to post warnings, given the City's alleged actual or implied notice of ongoing violent criminal activity, constituted a dangerous condition under Government Code section 835."

1.  **Applicable Law**

A public entity like the City is not liable for an injury arising out of an act or omission of the public entity or its

8

employees except as provided by statute.  (Gov. Code,[1] § 815, subd. (a).)  The sole statutory basis for imposing liability on public entities as property owners is section 835.  (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1347 (*Cerna*); *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1131–1132 (*Zelig*); *Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 438–439 (*Brenner*).)

Section 835 provides, a public entity is "liable for injury caused by a dangerous condition of its property if the plaintiff establishes that *the property was in a dangerous condition at the time of the injury*, that *the injury was proximately caused by the dangerous condition*, that *the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred*, and that either: [¶] (a) A *negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition*; or [¶] (b) The *public entity had actual or constructive notice of the dangerous condition* under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." (§ 835, italics added.)

A "dangerous condition" is defined as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."  (§ 830, subd. (a).)  The existence of a dangerous condition is ordinarily a question of fact but "can be decided as a matter of law if reasonable minds can come to only one conclusion."  (*Bonanno v.*

---

[1]     Undesignated statutory references are to the Government Code.

9

*Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 148 (*Bonanno*).)  The Legislature has specified that a "condition is not dangerous . . . if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial or insignificant nature in view of the surrounding circumstances that no reasonable person would conclude that the condition created a substantial risk of injury when such property . . . was used with due care in a manner in which it was reasonably foreseeable that it would be used." (§ 830.2.)

A claim alleging a dangerous condition may not rely on generalized allegations but must specify in what manner the condition constituted a dangerous condition.  (*Cerna, supra,* 161 Cal.App.4th at p. 1347; *Brenner, supra,* 113 Cal.App.4th at p. 439.)  A dangerous condition exists when public property "is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself," or possesses physical characteristics in its design, location, features or relationship to its surroundings that endanger users. (*Bonanno, supra,* 30 Cal.4th at pp. 148–149; see *Thimon v. City of Newark* (2020) 44 Cal.App.5th 745, 754 (*Thimon*).)

A public entity may be liable for a dangerous condition of public property even where the immediate cause of plaintiff's injury is a third party's negligent or illegal act if some physical characteristic of the property exposes its users to increased danger from third party negligence or criminality.  (*Cerna, supra,* 161 Cal.App.4th at p. 1348; *Bonanno, supra,* 30 Cal.4th at p. 152.)  But "it is insufficient to show only harmful third party conduct, like the conduct of a [grossly negligent] motorist."

(*Cerna*, at p. 1348.) " '[T]hird party conduct, by itself, unrelated to the condition of the property, does not constitute a "dangerous condition" for which a public entity may be held liable.' " (*Zelig, supra*, 27 Cal.4th at p. 1134.) There must be some defect in the physical condition of the property and that defect must have some causal relationship to the third party conduct that injures the plaintiff. (*Id*. at pp. 1134–1140 [see discussion].) "[P]ublic liability lies under section 835 only when a feature of the public property has 'increased or intensified' the danger to users from third party conduct." (*Bonanno*, at p. 155.)

2. **Analysis**

We review the FAC to ascertain whether it states facts sufficient to constitute a dangerous condition on public property pursuant to section 835.

Appellants' FAC identified three features that allegedly made the City's Darby Park parking lot dangerous: 1) the City's alleged failure to provide "any adequate precautions" such as "control measures, and/or security"; 2) the City's failure to provide security cameras in the Darby Park parking lot; and 3) the City's failure to provide "any adequate warning about the dangerous condition." We address each in turn.

a.    Failure to Provide Adequate Precautions

At the outset, we note case law provides that the presence or absence of security guards is *not* a physical characteristic of public property and thus not actionable as a dangerous condition. "A lack of human supervision and protection is not a deficiency in the physical characteristics of public property." (*Cerna, supra*, 161 Cal.App.4th at p. 1352; see *Zelig, supra*, 27 Cal.4th at pp. 1137, 1140, 1144–1145 [lack of police screening at courthouse

11

not a dangerous condition of property]; *Bartell v. Palos Verdes Peninsula Sch. Dist.* (1978) 83 Cal.App.3d 492, 497–498 [lack of supervision at school playground not a dangerous condition of property].)  Public entities, like the City, are immune from liability for asserted failures to provide security services and/or police presence.  (§ 845; *Zelig*, at pp. 1141–1147 [see discussion};  *Cerna*, *supra*, 161 Cal.App.4th at p. 1352.)  Thus, appellants cannot support their claim that a dangerous condition exists based on the City's alleged failure to provide security at Darby Park's parking lot.

To the extent appellants claim the City failed to provide "adequate precautions" for the "Darby Park gym to be closed to the public, including . . . measures that would have precluded [City] employees from opening the Darby Park gym to the public," we again find this does not support their claim that a dangerous condition exists.  The FAC does not sufficiently allege how a gymnasium open to the public, by itself, is a dangerous condition or is defective in such a way as to foreseeably endanger those using the property itself.

The FAC does not otherwise specify what other type of "adequate precautions" in the context of control measures and security the City failed to provide.  Claims against public entities must be specifically pleaded; generalized allegations about the dangerous condition will not suffice and, rather, "must specify in what manner the condition constituted a dangerous condition." (*Brenner*, *supra*, 113 Cal.App.4th at pp. 439; *Cerna*, *supra*, 161 Cal.App.4th at p. 1347.)

We conclude the FAC does not allege sufficient facts that the City's failure to provide "adequate precautions" can form the basis of a dangerous condition of public property claim.

###### b.     Failure to Provide Surveillance Cameras

The FAC next alleges the absence of security cameras in the Darby Park parking lot is a dangerous condition.

Appellants argue on appeal that they alleged a "viable and substantial dangerous condition claim based upon the City's actual or constructive notice of alleged ongoing shootings in Darby Park and the City's failure to install security cameras as a crime deterrent."  They argue this "is a matter of people being shot or otherwise injured on public property, a public park with alleged instances of known violent criminal behavior, that did not have installed security cameras that may deter criminal and gang conduct—and dying."

Appellants have not met their burden.

First, appellants allege there was "*ongoing* dangerous criminal activity" but refer to two shootings prior to January 5, 2021—one over 23 years ago (on December 8, 1997) and one nearly nine years ago (on October 15, 2012).  We find the reference to two crimes throughout a 23-year span does not constitute *ongoing* criminal activity.  The FAC noticeably does not reference any other crimes or shootings.  In addition, while the FAC specifies that the October 15, 2012 shooting was similar to the case before us, that is, "in the parking lot of D[a]rby Park," the December 8, 1997 shooting was not in the parking lot, but was actually "in Darby Park" per the wording in the FAC.  As a demurrer tests the adequacy of facts pleaded, these differences in the locations of the crimes alleged in the FAC do not assist appellants in sufficiently pleading *ongoing* criminal activity.  (See *Erfurt v. State of California* (1983) 141 Cal.App.3d 837, 844–845 [notice can be shown by the " '*long continued existence* of the dangerous or defective condition' "].)

13

At oral argument, appellants argued the City conceded it had notice of ongoing dangerous criminal activity during the underlying proceedings; however, the City confirmed it did not concede this issue. Appellants also argued their appeal is only with respect to the first element of section 835—whether the property was in a dangerous condition at the time of the injury—and believed the other elements were conceded as having been met. A review of the record, including the two pages referenced by appellants during oral argument, shows the trial court never found the remaining elements of section 835 were met; rather, the court only addressed the first element and found "the allegations within [the FAC] were insufficient to properly demonstrate the Darby Park parking lot 'was in a dangerous condition at the time of [Decedent's] . . . injury.' " Further, as explained above, our analysis in this regard faults appellants as not having adequately pleaded *ongoing* criminal activity in the FAC when it referenced two crimes throughout a 23-year span.

Second, determining whether a dangerous condition exists for which a public entity may be held liable is a complex question that rests on varied fact patterns. As the Supreme Court instructs us in *Zelig*, for purposes of deciding when a dangerous condition exists in cases involving third party conduct, it is necessary to address two elements. "The first is whether it can be said the defect complained of describes a dangerous *physical* condition and second, weather the dangerous condition has a *causal relationship to the third party conduct* that actually injured the plaintiff." (*City of San Diego v. Superior Court* (2006) 137 Cal.App.4th 21, 29, italics added [discussing *Zelig*].) As to the first element, the court in *Zelig* notes the necessary coupling of third party conduct and defective condition occurs where the

property itself exists in a dangerous condition, and that condition increases or intensifies the risk of injury to the public. (*Zelig*, *supra*, 27 Cal.4th at pp. 1136–1138.) Such condition "[m]ost obviously . . . exists when public property is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself." (*Bonanno*, *supra*, 30 Cal.4th at p. 148.)

For instance, in *Hayes v. State of California* (1974) 11 Cal.3d 469 (*Hayes*), the failure of a government entity to light a beach at night does not constitute a defective condition because unlit beaches are not inherently dangerous. (*City of San Diego v. Superior Court*, *supra*, 137 Cal.App.4th at p. 29 [discussing *Hayes*].) Similarly, in *Moncur v. City of Los Angeles* (1977) 68 Cal.App.3d 118, 126, locating lockers in an area of an airport terminal accessible to the public without weapons screening did not create a dangerous condition of property. However, public property where plantings obscured a stop sign has been held to be a defective condition (*De La Rosa v. City of San Bernardino* (1971) 16 Cal.App.3d 739, 745–746), as has an intersection with malfunctioning traffic signals (*Mathews v. State of California ex rel. Dept. of Transportation* (1978) 82 Cal.App.3d 116, 120).

Here, the FAC does not establish a sufficiently pleaded claim for dangerous condition of public property based upon a third party's shooting coupled with the absence of security cameras. We do not agree with the logic presented in appellants' argument on appeal. Darby Park's parking lot is not dangerous because it lacks surveillance cameras—it needs surveillance cameras if it is dangerous. Appellants may not presuppose the dangerousness of Darby Park's parking lot and then fault the

15

City for not installing surveillance cameras to deter said criminal conduct.

This is not like the fact pattern in *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 812–814, where the court held a *dangerous condition was created by untrimmed foliage* around a campus parking lot and stairway that *facilitated* the perpetration of an attempted rape.

Appellants rely on *Slapin v. Los Angeles International Airport* (1976) 65 Cal.App.3d 484, where the plaintiff was assaulted and injured by an unknown assailant while in a dark, unlit parking lot used by the airport. (*Id.* at p. 486.) The reviewing court in *Slapin* found the trial court erred in sustaining the demurrer without leave to amend because plaintiff's complaint adequately pleaded that the absence of proper lighting in an airport parking lot contributed to or facilitated the assault, where there was notice of ongoing criminal activity; it thus presented a defective/dangerous physical condition. (*Id.* at pp. 488, 490.) "That a mugger thrives in dark public places is a matter of common knowledge." (*Id.* at p. 488.)

The same cannot be said here, as the FAC does not sufficiently allege with the requisite particularity that the absence of surveillance cameras in Darby Park's parking lot *facilitated* a third party's shooting of decedent while in his vehicle in the parking lot, such that it is a defective or dangerous condition. " 'A condition is not dangerous "if the trial or appellate court, viewing the evidence most favorably to the plaintiff, determines as a matter of law that the risk created by the condition was of such a minor, trivial, or insignificant nature in view of the surrounding circumstances that no reasonable person

16

would conclude that the condition created a *substantial risk of injury* when such property or adjacent property was used with due care in a manner in which it was reasonably foreseeable that it would be used." ([§ 830.2].)' " (*Thimon, supra,* 44 Cal.App.5th at p. 754.) In the present case, the FAC does not plead sufficient facts to establish that the absence of security cameras created a substantial risk of risk of being shot. The "necessary causal connection between the condition of the property and [the] crime was not present." (*Zelig, supra,* 27 Cal.4th at pp. 1137, 1140.)

c.    Failure to Provide Adequate Warning

Third, appellants argue the FAC properly alleged that the City "maintained a dangerous condition" by failing to "provide adequate warning about the dangerous condition."

We have already found that the FAC did not adequately plead the existence of a dangerous condition, so as to require the City to provide warning of same. We have also found that the FAC did not sufficiently plead the existence of "ongoing criminal activity" such that the City had adequate prior notice, actual or constructive, of the condition. (See § 835.2, subd. (b).)

And finally, case law provides a public entity has no duty to warn against criminal conduct. *Hayes* held that the failure to post a warning that the beach was frequented by undesirable persons did not fall within section 835, since the problem of crime is well known to the public and the warning would be inconsistent with the administrative-legislative determination that the beach should be used by the public. (*Hayes, supra,* 11 Cal.3d at pp. 472–473 ["both public awareness of the prevalence of crime and policy factors militate against imposing a governmental duty to warn in circumstances such as these"].)

17

C.   ***The Trial Court Properly Sustained the Demurrer to the Negligence Cause of Action.***

As previously noted, a public entity like the City is not liable for an injury arising out of an act or omission of the public entity or its employees *except as provided by statute*.  (§ 815, subd. (a).)  "In other words, direct tort liability of public entities *must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care*, and not on the general tort provisions of Civil Code section 1714.  Otherwise, the general rule of immunity for public entities would be largely eroded by the routine application of general tort principles."  (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1183, italics added.)  As *Zelig* observed, " ' "[t]he intent of the [Tort Claims Act] is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances." ' " (*Zelig*, *supra*, 27 Cal.4th at p. 1127.)

Appellants fail to cite any statute which creates liability against the City for their claim.  The two statutes cited—sections 815.2, subdivision (a) and 815.4—both stand only for the proposition that a public entity may be liable for an act of an employee if the act falls within the course and scope of employment.  However, appellants' negligence cause of action is predicated on their dangerous condition on public property claim. The FAC alleges the City breached its duty of care by maintaining a dangerous/unsafe condition and for its failure to warn of the dangers thereon.  Thus, we agree with the trial court's assessment that because the first cause of action fails as a matter of law, appellants' second cause of action similarly fails.

18

Appellants concede the FAC was "not alleged as precisely as it could be" but refer us to sections 840.2 and 820, which they contend "clearly establish the government employee's liability for injury . . . aside from that of not maintaining a dangerous condition on its property." That may be true, but the fact remains, we are here on appeal following an order sustaining a demurrer, which tests the legal sufficiency of the operative pleading. We reject appellants' argument that "there is no need to cite to any statute which creates liability."

D. *Leave to Amend*

Generally, leave to amend is warranted when the complaint is in some way defective, but plaintiff has shown in what manner the complaint can be amended and " 'how that amendment will change the legal effect of [the] pleading.' " (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349.) Appellants shoulder the burden to show a reasonable possibility the defect in the FAC can be cured by amendment; if it can, the trial court abused its discretion in sustaining the demurrer without leave to amend. (*Dudek, supra,* 34 Cal.App.5th at pp. 163–164.)

Appellants have advanced amendments on appeal that they contend would cure the defects of the FAC. Because appellants are allowed to make this showing in the first instance to the appellate court, we will review their contention. (*Roman, supra,* 85 Cal.App.4th at p. 322.)

Appellants provide the FAC "did not include any specifics about the multiple shootings in Darby Park (other than giving the examples of the two previous murders)" and "did not address any additional problematic criminal activity in Darby Park which the City could have had notice of and which could have created a dangerous condition and a duty to warn." They further contend

19

they could add allegations regarding "crime in the areas of Inglewood immediately surrounding Darby Park [which] is relevant to any duty by the City to 'protect against' the dangerous condition, i.e., to provide notice, to install cameras, or to take other protective measures." Appellants believe they could amend the FAC to include this information which "could be obtained through discovery or independent additional investigation."

This is not enough.

"To satisfy that burden on appeal, a plaintiff 'must show in what manner he can amend his complaint and *how that amendment will change the legal effect of his pleading*.' [Citation.] The assertion of an abstract right to amend does not satisfy this burden. [Citation.] The plaintiff *must clearly and specifically set forth the 'applicable substantive law'* [citation] *and the legal basis for amendment*, i.e., the elements of the cause of action and authority for it. Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action. [Citations.] *Allegations must be factual and specific, not vague or conclusionary*. [Citation.] [¶] The burden of showing that a reasonable possibility exists that amendment can cure the defects remains with the plaintiff; neither the trial court nor this court will rewrite a complaint. [Citation.] Where the appellant offers no allegations to support the possibility of amendment and no legal authority showing the viability of new causes of action, there is no basis for finding the trial court abused its discretion when it sustained the demurrer without leave to amend." (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43–44, italics added; see *Hedwall v. PCMV, LLC* (2018) 22 Cal.App.5th 564, 579–580.)

20

Here, appellants' proposed allegations about "additional problematic criminal activity in Darby Park" and "crime in the areas of Inglewood immediately surrounding Darby Park" are vague and not specific. Appellants in no way explain how these proposed amendments would change the legal effect of the allegations in their FAC and merely state in a conclusory fashion that they "could have created a dangerous condition and a duty to warn." Furthermore, appellants fail to propose any new facts addressing the main issue of the FAC as we see it, i.e., how the City's alleged failure to install surveillance cameras in the parking lot of Darby Park amounts to a dangerous condition. We therefore affirm the trial court's order denying leave to amend.

## DISPOSITION

We affirm the judgment of dismissal and the underlying order sustaining the demurrer to the causes of action for dangerous condition on public property and negligence. Costs on appeal are awarded to respondent City of Inglewood.


**CERTIFIED FOR PUBLICATION**



STRATTON, P. J.

We concur:



WILEY, J.                                        VIRAMONTES, J.

21

**WILEY, J., Concurring.**

The gravity of this case is sobering.  The Summerfields' son Andrew was murdered when he went to play in the park.  The family's loss is overwhelming.

Despite their anguish, the Summerfields cannot hold the City of Inglewood liable for the act of an unknown killer.  The analysis requiring this conclusion illustrates the deep structure of modern tort law—a simple structure that lends predictability to the law and that unites our result with nearly 80 years of California tort jurisprudence.

In 1944, Justice Roger Traynor told us how to decide this type of case:  public policy demands judges in tort suits fix responsibility where it will most effectively reduce hazards.  (See *Escola v. Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 462 (*Escola*) (conc. opn. of Traynor, J.).)  The Traynor approach imposes tort duties on defendants when the expected safety benefit outweighs the burden, but refrains when the burden exceeds the expected benefits.  A leading tort scholar aptly summarizes Traynor's approach as "the torts lodestar:  the irresistible simplicity of preventing harm."  (See Sharkey, *The Irresistible Simplicity of Preventing Harm* (2023) 16 J. Tort L. 143, 143.)

The logic and power of Traynor's approach have, since 1944, made it into national as well as California law.  (See *Air and Liquid Systems Corp. v. DeVries* (2019) 586 U.S. __, __ [139 S.Ct. 986, 994–995] [majority opinion determines tort duty by analyzing who is in the better position to prevent the injury]; *id.* at p. __ [997] (dis. opn. of Gorsuch, J.) [dissent uses same method]; see generally Sharkey, *Modern Tort Law: Preventing*

1

*Harms, Not Recognizing Wrongs* (2021) 134 Harv. L.Rev. 1423, 1423, fn. 3, 1435–1444.)

The Traynor approach resolves this case.

The Summerfields seek to impose a tort duty that is unprecedented:  they cite no law requiring a city to post cameras in parks.

Justice Traynor certainly was willing to recognize novel tort duties.  He was famous for doing so.  (See White, The American Judicial Tradition (3d ed. 2007) pp. 243–266.)  But he imposed only duties that were cost-justified from a social viewpoint.  His approach puts demands on plaintiffs aiming to create new law.

We must ask whether the Summerfields give us a reliable basis for thinking the expected benefits of their proposed safety measures would outweigh the expected burdens.

What exactly are the Summerfields proposing?

To start, they urge us to mandate a duty for every municipality (and, logically, every public entity) in California to install, maintain, and monitor security cameras at every park (and, logically, every public facility) where there has been criminal violence.  The duty would seem to include hiring trained personnel to respond rapidly and visibly to brewing violence, for the streetwise would be unimpressed by mere Potemkin cameras.

Where do the Summerfields propose the cameras go?  How many locales experience criminal violence?  Thirty-five years ago, the California Legislature counted nearly 600 criminal street gangs in California and hundreds of yearly gang-related murders in Los Angeles alone.  (Pen. Code, § 186.21.)

Our county's murder problem is widespread.  (See, e.g., "The Homicide Report," an ongoing project of the L.A. Times

attempting to document every known homicide in Los Angeles County, available at <homicide.latimes.com>. As the project's main page changes rapidly, sometimes many times a day, its Frequently Asked Questions page <homicide.latimes.com/about/> [as of Oct. 24, 2023], is archived at https://perma.cc/K5AP-PDHQ.)

This proposed new duty would require many mandatory locations for the Summerfields' cameras.

Although the Summerfields ask us to use the power of tort incentives to impose a sizeable public works program on public entities, they offer no reason to think the expenditure would be rational. Their proposal gives no confidence the safety benefits would outweigh the burden.

The California Supreme Court rejected similarly unpromising proposals to combat gang violence when it decided *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1210–1223 (*Castaneda*). A gang member's bullet wounded plaintiff Ernest Castaneda, who lived in a mobile home park near the gang-affiliated Levario family. Paul Levario was hosting fellow Northside gang members in his home when rival Westside gang members arrived outside. Northsiders emerged from Levario's home, exchanged insults with the Westsiders, and shot bystander Castaneda by accident. (*Id.* at pp. 1210–1211.) Castaneda presented evidence about recent park gang activity, including gun shots. (*Id.* at pp. 1211–1212.) He sued the park owner for renting to the gang members, for failing to hire guards, and for failing to install brighter lights. (*Id.* at pp. 1216–1223.)

Our Supreme Court conducted a social utility analysis and concluded Castaneda's proposed tort duties were not worthwhile. Creating a duty not to rent to gang members would be imposing

3

"a burdensome, dubiously effective and socially questionable obligation on landlords, at least absent circumstances making gang violence extraordinarily foreseeable." (*Castaneda*, *supra*, 41 Cal.4th at p. 1217.) "Given the extraordinarily burdensome nature of the duty plaintiff seeks to impose and its likely social cost, we conclude much greater foreseeability than that demonstrated here would be required to recognize the duty not to rent housing to gang members." (*Id.* at p. 1218.) Similarly, "a shoot-out between two rival gangs was not highly foreseeable, and [the park owner] did not have a tort duty to prevent it by evicting the Levarios." (*Id.* at p. 1222.) Concerning Castaneda's proposed duty that the park owner hire guards, "common experience" suggested this "heavily burdensome" measure would have been ineffective: it was unlikely to have deterred "Levario from entertaining an individual guest inside his home." (*Id.* at pp. 1223, 1222.) As for brighter illumination, the Supreme Court rejected this proposal "[g]iven that the occupants of the mobilehome . . . were willing to engage in an armed confrontation with rival gang members where lighting allowed their weapon to be seen and themselves to be recognized . . . ." (*Id.* at p. 1223.) That is, the possibility the shooters would be identified and prosecuted was too dubious a safety incentive to place on the park owner a brighter-illumination duty—whatever that actually might mean.

In short, the *Castaneda* court decided the proposed safety precautions were burdensome and not clearly cost-justified. This approach follows Justice Traynor in spirit. It is familiar and authoritative. (E.g., *Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1025 [no duty of care when the social utility of the activity is great and avoidance of injuries is socially burdensome]

4

(*Kuciemba*); *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1150, 1153 [courts assign tort duty to ensure those best situated to prevent injuries are incentivized to do so]; *Morris v. De La Torre* (2005) 36 Cal.4th 260, 277–278 [proprietor's duty to patrons includes an obligation to call 911 about an ongoing assault or to take similarly minimal safety measures]; *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 238–250 [to protect patron from crime, a tavern has the duty to take minimally burdensome steps, but not costly security measures]; *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 473–475 (*Parsons*) [court determined duty by conducting a "social utility analysis" that weighs the utility of proposed safety measures against their burdens]; *Taylor v. Centennial Bowl, Inc.* (1966) 65 Cal.2d 114, 123–124 [duty to protect arose because defendant "easily" could have undertaken the proposed protective measure].)

Using this Traynor style of analysis, the Supreme Court rejected a surveillance camera proposal in a different case. After an unknown assailant assaulted her in a parking garage, the plaintiff in *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181 sued the garage owner for failing to institute adequate security precautions. The plaintiff faulted the garage because it did not have working surveillance cameras. (*Id.* at p. 1189.) The Supreme Court rejected this camera proposal because "it is questionable whether plaintiff's proposed measures would have been effective to protect against the type of violent assault that occurred here. . . . [S]urveillance cameras do not deter all crime and criminals do not confine their activities to locations that are untidy or unkempt. . . . [S]urveillance cameras may be ineffectual to protect against crime unless there are employees who are available to continuously monitor video transmissions

5

and respond effectively when suspicious or criminal behavior is observed. . . . [A] requirement that owners . . . provide 'adequate' security monitoring through existing personnel would be vague and impossible to define . . . ." (*Id.* at p. 1196.) The opinion likewise noted "the substantial monetary and social costs associated with the hiring of security guards." (*Id.* at p. 1192, see also p. 1195.)

In short, the *Castaneda* court reached the same conclusion as the *Sharon P.* decision: the plaintiffs were proposing burdensome safety measures that were not clearly cost-effective. Both courts refused to impose those duties on the property owners. Justice Traynor would have approved.

The same problems plague the Summerfields' safety proposals. Their proposals raise questions but offer no clear answers about the balance of burdens and benefits. Would cameras in parks save a single life? How deterred are shooters by cameras in a park or elsewhere? If shooters are impulsive or poor at considered analysis, they will not be thinking much about cameras. And if a shooting is planned rationally, will not this thoughtful and determined shooter merely shift the attack to beyond the camera's range? Will face masks, vandalism, and spray paint over the cameras' lens counteract their effectiveness? And so on. The chain of questions is lengthy. Cascading problems afflict the Summerfields' camera idea.

Tort plaintiffs seeking to impose unprecedented tort duties must make proposals that are specific as well as plainly cost-effective. The proposals must be specific enough for common law judges to size them up in a practical way. (Cf. *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1140 (*Zelig*) ["plaintiffs are unable to point to the manner in which the physical condition of

the property should have been altered to prevent the shooting"].) And the cost-effectiveness must be obvious and intuitive, for common law judges cannot use finely-calibrated quantitative methods to calculate precise burdens and benefits.

To expand a bit on this last point, the Traynor burden-balancing approach uses what fairly may be called cost-benefit analysis, but it is not the *quantitative* analysis familiar to economists and policy analysts: the estimation of figures in dollars and cents on two sides of a ledger. Common law judges use common sense, not numbers, to decide our cost-benefit questions. For many reasons, we rarely have recourse to quantitative data and numerical methods. Our weighing of probable burdens and benefits unavoidably is qualitative, which means proposals will fail unless their virtues are clear. And the virtues of the proposals here are not.

Essentially the same analysis thus governs the Summerfields' dangerous conditions claim, which merely robes their negligence count in a tort cloak of a different color. This case is the opposite of *Rowland v. Christian* (1968) 69 Cal.2d 108, where Nancy Christian knew the bathroom faucet handle in her apartment was cracked and needed replacing. Christian invited James Rowland to the apartment. Rowland said he was going to the bathroom. The handle broke and cut Rowland when he tried to use it. The court held Christian owed a duty to warn Rowland of the faucet crack. (*Id*. at pp. 110–112.) It would have cost Christian little to share her knowledge of the dangerous condition with Rowland. The information would have allowed Rowland to take suitable care. Imposing this safety duty on the knowledgeable property possessor was socially rational, and obviously so.

By contrast, in this case we can have no confidence the burdensome measures the plaintiffs propose would be of practical benefit in reducing the risk of harm.

This case thus is similar to *Parsons*. Darrell Parsons was riding his horse on an urban bridle path when a truck noisily lifted a nearby trash bin. The crashing sound made the horse bolt; the frightened animal threw Parsons to the ground. (*Parsons, supra*, 15 Cal.4th. at p. 462.) Parsons sued the trash company. The Supreme Court ruled the company owed Parsons no tort duty. The Supreme Court used a "social utility analysis" to evaluate safety measures the trash company could have taken: "changing the hours of collection, temporarily 'blocking off' the area with warning cones or tape, posting warning signs, providing riders with a schedule of collection times, or a combination of these methods." (*Id*. at p. 474.) The court rejected Parsons's proposals because they would increase "the burden on machine operators over what was considered reasonable." (*Ibid*.) These precautions "unreasonably would impair the utility" of the trash company, which ran a business "of high social utility." (*Ibid*.) And imposing these duties on the trash company would imply similar restrictions on a wide "range of socially useful activities that may produce such noises and provoke such fright." (*Id*. at pp. 474–475.)

In sum, this qualitative judicial cost-benefit analysis showed the safety program Parsons proposed was not worth its burden. (Cf. *Zelig, supra,* 27 Cal.4th at p. 1139 ["it does not appear that the addition of a physical barrier, by itself, would have had any effect on the risk of harm"].) There were no mathematical calculations of quantitative data to reach this conclusion. Common sense alone showed Parsons's idea was bad.

Common sense also is apparent in *Zelig*, the main decision the Summerfields cited in oral argument. In 1995, Eileen Zelig was at a county courthouse seeking child support from her ex-husband. In the courthouse, he shot her to death. "Lisa Zelig, then six years of age, witnessed her father shoot her mother in the chest at point-blank range." (*Zelig, supra,* 27 Cal.4th at p. 1118.) The Zelig children sued the county for failing to install gun screening with physical barriers and metal detectors.

The Supreme Court in *Zelig* ruled the county did not have a tort duty to take these security measures.

The *Zelig* case posed common-sense questions like those in this case. The murderous ex-husband was willing to kill in a public place where nearby police made his immediate arrest a certainty. Would gun screening at courthouses have been a cost-effective safety measure against this heedless and homicidal man? Or would gun screening merely have diverted him to the sidewalk outside or to some other crime scene? (See *Zelig, supra*, 27 Cal.4th at pp. 1139–1140.) Surely there would be *some* safety benefit to gun screening, just as surely there would be some safety benefit to installing cameras. But would the benefit offset the sizeable cost? Maybe. But maybe is not certain enough. When the certainty of the calculus is beyond the judicial ken, courts say no and leave the issue to legislators or executives who can weigh the available funds and the competing demands and can answer " 'an allocative question best left to the political branches.' " (See *id.* at p. 1127 [quoting Sklansky, *The Private Police*, 46 UCLA L.Rev. 1165, 1282].)

Is it callous to discuss cost-benefit analysis when human life is at risk? No, it is beneficial, rational, and objective. Courts must analyze cases involving people like Andrew Summerfield, as

well as Eileen Zelig, whose six-year-old daughter looked on as she was shot to death. Despite the distressing human trauma, we are to remain attentive to legal doctrine. Courts are aware of the human lives at stake, but empathy coexists with and cannot supplant allegiance to the law. Public officials weigh dollar costs against the risk of human injury every time they economize with a flat rail crossing instead of a safer but more expensive overpass. These tradeoff decisions are unavoidable. The public benefits when they are rational.

Our result here is consistent with the Supreme Court's recent decision in *Kuciemba*, where the court held employers owe no duty of care to prevent the spread of COVID-19 to employees' household members. (*Kuciemba, supra*, 14 Cal.5th at p. 1033.) The costs of this proposed duty seemed staggering, while the benefits seemed doubtful. The court wrote " 'the pool of potential plaintiffs isn't a pool at all — it's an ocean.' " (*Id.* at p. 1029, quoting *Ruiz v. ConAgra Foods Packaged Foods LLC* (E.D.Wis. 2022) 606 F.Supp.3d 881, 888.) Imposing a duty to the household members of employees had the potential to alter employers' behavior in socially harmful ways. "[E]ven with perfect implementation of best practices, the prospect of liability for infections outside the workplace could encourage employers to adopt precautions that unduly slow the delivery of essential services to the public." (*Kuciemba, supra*, 14 Cal.5th at p. 1028.) And the benefits to such a duty were dubious, given that employers "cannot fully control the risk of infection because many precautions, such as mask wearing and social distancing, depend upon the compliance of individual employees. Employers have little to no control over the safety precautions taken by employees or their household members outside the workplace. Nor can they

10

control whether a given employee will be aware of, or report, disease exposure." (*Id.* at pp. 1026–1027.)  Facing a lopsided social "calculus" (*id.* at p. 1025), the high court reached the same conclusion we do:  no duty.

The same style of analysis negates the Summerfields' failure-to-warn idea.  What assurance is there that their proposal, if given force by tort law, would have any result besides warning signs everywhere that everyone ignores?  (Cf. *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 363 [when every firm must warn everybody about everything, the costly exercise does no good, for to warn of all potential dangers is to warn of nothing]; *Hayes v. State of California* (1974) 11 Cal.3d 469, 472–473 [it is indisputable the public is aware of the incidence of violent crime, so it would serve little purpose further to remind the public].)

The irresistible simplicity of preventing harm means courts should impose tort duties on defendants when the expected safety benefits outweigh the burden, but refrain when the burden exceeds the expected benefits.  This case fits the second category.  The trial court was right to sustain this demurrer.


WILEY, J.


11